[No. 18538-5-II. Division Two. August 9, 1996.]
THE STATE OF WASHINGTON, *Respondent*, v. DONALD EARL STOCKMYER, *Appellant*.

*Brett A. Purtzer* and *Law Offices of Monte E. Hester, Inc., P.S.*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney,* and *Barbara L. Corey-Boulet, Deputy,* for respondent.

TURNER, J. — Donald E. Stockmyer appeals his jury conviction of first degree manslaughter and second degree assault with a deadly weapon, arguing that the trial court

erred by: admitting evidence that the decedent was a retired Washington State Trooper; excluding a videotaped re-enactment of the crime produced by defense counsel; and failing to issue a unanimity instruction to the jury. We affirm.

## FACTS

In September 1993, Kathy Johnson was living on Albert Gratzer's land in her travel trailer. On the morning of September 18, 1993, Gratzer's dog was attacked and mortally wounded. Gratzer was upset, and, believing that Kathy Johnson's dogs were responsible, asked her to take her trailer and leave his property. The incident generated harsh words between Kathy Johnson and several of Gratzer's friends, including next door neighbors George and Jane Benson.

Ms. Johnson began making preparations to leave, but explained to Gratzer's daughter, Alberta Heagle, that she couldn't do so without a vehicle equipped for towing. Apparently to obtain such a vehicle, she drove to the home of a friend, Donald Stockmyer, which was about 45 minutes away. She told him about the morning's events, and that she was being asked to move.

Stockmyer drove her back to Gratzer's, went to Gratzer's front door, and, believing the Bensons to be inside, angrily demanded to speak to "the bitch . . . that mouthed off at [Kathy Johnson]." He stood on the porch, swore at Gratzer's family and friends, and demanded an apology for Ms. Johnson. He became increasingly confrontational and profane. He refused to leave. When Alberta Heagle threatened to call police, Stockmyer told her to go ahead: "Call the police." Her husband, Carl Heagle, then grabbed Stockmyer's arm, saying "I am the police." Stockmyer retorted: "I don't care who you are. I told you to keep your hands off of me."

George Benson stepped out onto the porch, and Stockmyer backed off the porch and into the yard. A scuffle

ensued between Benson and Stockmyer, and the two fell to the ground.[1] Carl Heagle intervened and tried to pull Stockmyer off Benson. Stockmyer removed a .44 magnum Derringer from his pocket, struck Benson in the head with it, and then shot Heagle in the throat. Next, he either pointed the gun at Benson and threatened him directly, or waved it in the air and made generalized threats toward everyone.[2]

Everyone except Kathy Johnson and Carl Heagle (who lay dying) fled and sought shelter. Thereafter, Stockmyer turned the weapon over to Kathy Johnson and waited at the scene until police arrived. The gun still contained one live round.

On May 3, 1994, a Pierce County jury convicted Stockmyer of first degree manslaughter in the shooting of Carl Heagle, and second degree assault with a deadly weapon for the assault on George Benson. Stockmyer now appeals.

## ANALYSIS

### Admission of Evidence that Decedent was a Retired Washington State Trooper

By motion in limine, Stockmyer asked that the State "be precluded from referring to the deceased, Carl Heagle, as a former Washington State Patrolman or other like reference." He argued that such references were irrelevant and "would inflame the jury to obtain their sympathies that an individual with law enforcement died." The trial court denied Stockmyer's motion.

---

[1]Testimony was mixed on how the physical altercation began.

[2]Benson testified that as he tried to approach the wounded Heagle, Stockmyer turned and pointed the gun directly at him and said "Go ahead, I've still got one in here. I can do you in, too." Stockmyer then held the gun in the air saying "I might as well kill all of you." Stockmyer denies pointing the gun at Benson, but admits he picked the gun up from the ground after he shot Heagle. He also testified that Benson appeared to be coming toward him again, implying that he needed to defend himself. Benson's wife, Jane, testified that Stockmyer pointed the gun at her husband and threatened him, and also made generalized threats toward all present. It is uncontroverted that the gun still contained one live cartridge.

On appeal, Stockmyer argues generally that references to the victim's occupation were irrelevant or unduly prejudicial, and contrary to ER 401 ("relevant evidence") and ER 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time). The State contends that evidence of Heagle's background and training as a police officer and supervisor of other troopers[3] was relevant because Stockmyer raised the issue of self-defense.

"Relevant evidence" is evidence that tends to make the existence of a fact of consequence to determination of the action more or less probable than it would be without the evidence. ER 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. ER 403.

■■ We review a trial court's evaluation of relevance under ER 401 and its balancing of probative value against its prejudicial effect under ER 403 with a great deal of deference. *State v. Luvene*, 127 Wn.2d 690, 707, 903 P.2d 960 (1995); *State v. Russell*, 125 Wn.2d 24, 78, 882 P.2d 747 (1994), *cert. denied*, 115 S. Ct. 2004 (1995). Here, the trial court decided that evidence of Heagle's former occupation would be helpful to the jury, and would not unduly prejudice Stockmyer by triggering juror sympathy for the victim.[4] We agree. Because Heagle told Stockmyer at the time of the altercation that he "[was] the police," evidence of Heagle's prior occupation was relevant to Stockmyer's state of mind and his intent at the time of the offense. This, in turn, was a fact of consequence to the action, due to the substantive law of self-defense.[5] The trial court did

---

[3]Heagle held the rank of sergeant at the time of his retirement.

[4]We note Judge Swayze's references to recent well-publicized incidents of alleged police brutality, and his inference that it can no longer be assumed that evidence of a victim's police background results in prejudice to a defendant's case.

[5]See *State v. Hughes*, 106 Wn.2d 176, 189, 721 P.2d 902 (1986)(justification of self-defense must be evaluated from the defendant's point of view at the time of

not abuse its discretion in admitting evidence of Heagle's former occupation.

## Precluding from Evidence a Videotape Reenactment

Stockmyer sought to introduce as demonstrative evidence a 30-second videotape reenactment of the altercation between Stockmyer, Benson, and Heagle. It was offered to show the rapidity with which the events occurred and to corroborate the testimony of several defense witnesses.[6]

The videotape was produced more than six months after the crime. Defense counsel obtained permission from the victim's 80-year-old father-in-law, Albert Gratzer, to "[come] out to take some pictures" at the scene of the altercation in Gratzer's front yard. Defense counsel arrived with eight or nine persons, including Kathy Johnson and Stockmyer's brother. For over two hours, they videotaped three different portrayals of the assault on George Benson and the killing of Carl Heagle. An edited 30-second tape was offered in evidence.

Kathy Johnson was the only cast member who was also present at the incident. She provided her recollection of the events to the others. The other actors portrayed Stockmyer, gunshot victim Carl Heagle, his wife Alberta Heagle, assault victim George Benson, and his wife, Jane Benson. Each of the participants depicted in the video — with the obvious exception of decedent Carl Heagle — were available at the trial and testified.

The trial court judge viewed the videotaped reenactment and ruled against its admission explaining:

> [E]verything that happens in the courtroom, whether it be an actual demonstration of location of individuals involved in

the act); *State v. Jones,* 95 Wn.2d 616, 624, 628 P.2d 472 (1981); *State v. Bergeson,* 64 Wn. App. 366, 370 n.2, 824 P.2d 515 (1992).

[6]The videotape was not made part of the record for our review; thus our analysis is based upon descriptions of the video's content from testimony in the record.

the altercation or simply a verbal description of what occurred, [is] demonstrative evidence from the standpoint that it conjures up in the mind of the finder of fact, the jury, a mental picture as to just what occurred and how it occurred and how rapidly it occurred. The difference between that and this video is that each one of those images which is created is created here in the courtroom and is subject to cross-examination . . . . And in spite of the defense assertion that everything portrayed therein is subject to cross-examination, certainly the participants . . . , the manner in which the enactment was put together . . . , [and] film speed [are] not subject to cross examination. [In the defense offer of proof, Ms. Johnson] indicated that the actual events were faster than the video[,] . . . and also that there were two other factual inaccuracies pertaining to it: the gun was not dropped, as she testified it was, and the people were very, very different.

 Demonstrative evidence may be admissible if the experiment was conducted under conditions reasonably similar to conditions existing at the actual event. Whether the similarity is sufficient is for the trial court's discretion. *State v. Rogers*, 70 Wn. App. 626, 633-34, 855 P.2d 294 (1993), *review denied*, 123 Wn.2d 1004 (1994). Pictures that accurately represent the true state or condition of the thing depicted are admissible if they have probative value on some element of the crime charged. The trial court's decision regarding the admission of photographic or videotaped evidence will not be disturbed on appeal absent a manifest abuse of discretion. *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983); *United States v. Carpenter*, 933 F.2d 748, 751 (9th Cir. 1991).

Stockmyer argues that corroboration of witness' testimony is allowed through videotape evidence and that videotape re-enactments are admissible. He is correct insofar as videotapes have been permitted in evidence.[7] Stockmyer is incorrect, however, in asserting that *State v.*

[7] See, for example, *State v. Strandy*, 49 Wn. App. 537, 745 P.2d 43 (1987), *review denied*, 109 Wn.2d 1027 (1988). Strandy argued, unsuccessfully, that he was prejudiced by an accumulation of visual evidence when a videotape made at

*Rogers,* 70 Wn. App. 626, 855 P.2d 294 (1993) *review denied,* 123 Wn.2d 1004 (1994), allows admission of videotaped re-enactments of a crime. The videotape in *Rogers* was not a re-enactment of the crime. There, simulated conditions preceding a vehicular homicide were videotaped from inside a car. The car was driven at various speeds over the path the defendant's vehicle traveled before the accident. The jury was instructed to disregard any differing conditions and to consider the evidence only for what a driver might see at those speeds. The Court of Appeals held that the trial court did not abuse its discretion in admitting the tape and noted that "the jury was fully capable of determining what weight to accord this evidence." *Rogers,* 70 Wn. App. at 634.

Several cases from other jurisdictions have addressed this issue. *People v. Wendel,* 123 A.D.2d 410, 411 (N.Y. App. Div. 1986), held that admission of a videotape demonstration of an actor climbing through a burglary victim's window was improper, but not reversible error in light of other overwhelming evidence. In *Branch v. State,* 774 S.W.2d 781 (Tex. App. 1989), a murder defendant sought to admit a videotaped re-enactment of the offense prepared by a television station Crime Stoppers program. The appeals court upheld the refusal to admit the videotape, saying: "The end result was a hearsay upon hearsay product which could not be fairly used to impeach any of the original participants." *Branch,* 774 S.W.2d at 787. In *Lopez v. State,* 651 S.W.2d 413, 414-15 (Tex. App. 1983), the court said "the concept of recreating human events with the use of actors is a course of conduct that is fraught with danger. . . . The danger of jurors branded with tele-

---

the crime scene, as well as still photographs taken there, were admitted into evidence. The court held:

> In determining whether photographs should be admitted, the trial court must determine whether the probative value of the evidence outweighs its prejudicial effect. *State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983). The test is identical for videotapes. *State v. Brooks,* 30 Wn. App. 280, [286,] 633 P.2d 1345, *review denied,* 96 Wn.2d 1021 (1981). [*Strandy,* 49 Wn. App. at 541.]

vision images of actors, not testimony, is too great to ascertain."

Here, the trial court raised justifiable concerns over the videotaped re-enactment's factual inaccuracies and potential prejudicial effect. Whether the similarity of demonstrative evidence is sufficient to justify admission is within the sound discretion of the trial court. *Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 555, 815 P.2d 798 (1991).

The trial court did not abuse its discretion by denying admission of the videotape into evidence.

## Unanimity Instruction

Stockmyer contends that the jury verdict was not unanimous as to which of two events constituted second degree assault against George Benson. He argues that where evidence shows multiple acts of like misconduct, the state is required to elect which act it is relying upon for a conviction.

While conceding that the entire incident took place in a "matter of seconds," Stockmyer argues that evidence pointed toward two different assaults against Benson. The first occurred when Stockmyer struck Benson in the head with the gun. The second occurred when Stockmyer picked up the gun and either waved it in the air, or pointed it toward Benson. Stockmyer denied pointing the gun at Benson or threatening him and argued that both alleged assaults were self-defense. No instruction required the jury to find unanimously that one specific act constituted the crime. Stockmyer argues that rational jurors could have reasonable doubts about one incident or the other. If some jurors found him guilty based upon the first occurrence, and others the second, Stockmyer argues he was deprived of his constitutional right to a unanimous jury verdict.

■ The court in *State v. Crane*, 116 Wn.2d 315, 324-26, 804 P.2d 10, *cert. denied*, 501 U.S. 1237 (1991), states the law in Washington on jury unanimity:

In Washington, a defendant may be convicted only when a unanimous jury concludes the criminal act charged in the information has been committed. *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984). When the prosecutor presents evidence of several acts which could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specified criminal act. *State v. Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988) (citing *Petrich*, [101 Wn.2d] at 570; *State v. Workman*, 66 Wash. 292, 294-95, 119 P. 751 (1911)). In multiple act cases, when the State fails to elect which incident it relies upon for the conviction or the trial court fails to instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, the error will be deemed harmless only if no rational trier of fact could have entertained a reasonable doubt that each incident established the crime beyond a reasonable doubt. *Kitchen*, [110 Wn.2d] at 405-06 (modifying the harmless error standard enunciated in *Petrich*). Since the error is of constitutional magnitude, it may be raised for the first time on appeal. *Kitchen*, [110 Wn.2d] at 411.

The *Petrich* rule applies only to multiple act cases (those cases where several acts are alleged, any one of which could constitute the crime charged). *See, e.g., Kitchen*, [110 Wn.2d 403] (one count of second degree rape stemming from several separate sexual acts occurring between July 1983 and October 1983); *Workman*, [66 Wash. 292] (one count of statutory rape stemming from evidence of three distinct sexual acts occurring at different times and places); *State v. Gitchel*, 41 Wn. App. 820, 822, 706 P.2d 1091 (one count of statutory rape arising out of two separate sexual acts which occurred "on or about June to July, 1983"), *review denied*, 105 Wn.2d 1003 (1985).

There are also two alternative approaches to the *Petrich* rule which have relevance in this case. The first is known as the "alternative means" approach, where a single offense may be committed in more than one way. In this situation, there must be jury unanimity as to guilt for the single crime charged. *Kitchen*, [110 Wn.2d] at 410. Unanimity is not required, however, as to the means by which the crime was

committed so long as substantial evidence supports each alternative means. *Kitchen*, [110 Wn.2d] at 410. These cases usually involve a charge under a statute which contains several alternative ways of committing one crime, and the defendant has been charged with conduct which may fulfill more than one alternative. . . .

The second alternative which sometimes occurs in the context of unanimous jury instruction cases involves the "continuous act." In these cases, a continuing course of conduct may form the basis of one charge in an information. *Petrich*, [101 Wn.2d] at 571. As the court in *Petrich* points out, however, ' "one continuing offense' must be distinguished from 'several distinct acts,' each of which could be the basis for a criminal charge." *Petrich*, [101 Wn.2d] at 571 . . . . *See also State v. Gooden*, 51 Wn. App. 615, 745 P.2d 1000 (no need for jury unanimity as to each specific act of prostitution when there was unanimity as to a continuing course of conduct), *review denied*, 111 Wn.2d 1012 (1988). [*Crane*, 116 Wn.2d at 324-26 (some citations omitted).]

The court in *Crane* applied the continuous conduct exception alternative to the *Petrich* rule to potentially fatal incidents of assault occurring during a two-hour period, stating:

Under this analysis, a unanimous jury verdict would not be required as to each incident of assault during this short period of time; instead, the jury would only need to be unanimous in its determination that the conduct occurred. *State v. Petrich, supra* [101 Wn.2d] at 571.

*Petrich* requires an election or unanimity instruction in cases where evidence *supports several criminal acts* which would support conviction of a criminal offense. In this case, the evidence supports only a small time frame in which the fatal assault could have occurred. For this reason, a continuous course of conduct analysis is better suited to the evidence presented. [*Crane*, 116 Wn.2d at 330.]

Applying *Crane's* continuing course of conduct analysis here, we find no reversible error. The jury was unanimous in its determination that an assault occurred. The

potential assaults took place in a "matter of seconds." No special unanimity instruction was required.

■ Even if we were to analyze this case as a multiple act case, failure to give a unanimity instruction would be harmless. Overwhelming evidence exists for the jury to conclude that the elements were established in both potential assaults. No rational trier of fact could entertain a reasonable doubt that each incident established the crime. Testimony was unanimous regarding Stockmyer's striking Benson in the head with the gun. Uncontroverted evidence showed that, after shooting Heagle, Stockmyer grabbed the gun, which had fallen to the ground 10 to 12 feet away. He then either waved it in the air, making generalized threats of harm, or pointed it at Benson and threatened him directly. In any event, Benson retreated in haste. At that moment, Heagle was dying of a gunshot wound from this very weapon. A rational juror would logically conclude beyond a reasonable doubt that Stockmyer's action induced in Benson a reasonable apprehension and fear of imminent bodily injury.[8]

We affirm.

MORGAN and BRIDGEWATER, JJ., concur.

---

[8]The jury was clearly instructed that the elements of assault include "an intentional act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury."