

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2016 SEP -6 PM 8: 49

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73440-7-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ERICK WALKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 6, 2016 |

SPEARMAN, J. — Erick Walker challenges his conviction of four counts of first degree assault, five counts of drive by shooting, and first degree manslaughter. He argues that the trial court erred in admitting his custodial statements. Walker also argues that the trial court erred in denying his motion to suppress evidence obtained from the execution of search warrants, limiting his cross examination, admitting demonstrative evidence, and allowing the jury to consider the charge of first degree murder. Finding no error, we affirm.

## FACTS

Ten shots were fired in Lake Stevens and Marysville on the night of June 1–June 2, 2013. One of the shots struck and killed M.C. as she was walking on the side of the road with several friends. The other shots were fired into homes

and parked cars. People were home and lights were on at each of the houses that were shot.

Several witnesses believed the shots were fired from a car. The girls walking nearest M.C. stated that the shot was fired from a passing car. The girls described the car as black or gray. One of the girls saw a flash from the passenger side window.

In Marysville, one witness reported seeing a dark car pass slowly by his house shortly before a shot was fired. Another witness heard gunshots, dropped to the floor, and looked through a screen door. He saw a car backing away from a parked Saturn. The Saturn was rocking and appeared to have just been hit. The other car drove away. From paint transferred in the collision, investigators determined that the car that struck the Saturn was black. Broken car parts collected at the scene appeared to be from the headlight of the striking car.

Police initially recovered five bullets from the shootings, three from Lake Stevens and two from Marysville.[1] They did not recover the bullet that killed M.C. No bullet casings were recovered from any of the sites.

Analysis of the recovered bullets determined that they were all .30 carbine caliber, a relatively uncommon ammunition usually fired by Ruger Blackhawk revolvers, M-1 carbine rifles, or M-1 Enforcer handguns. An analyst concluded that the same gun fired all three of the bullets recovered from the Lake Stevens sites and that the same gun fired both of the bullets recovered from the

---

[1] The police later recovered three more bullets and a partial bullet and submitted these for analysis.

Marysville sites. But the analyst could not conclusively determine if all of the bullets had been fired by the same gun or if two different guns had been used.

A police officer contacted the local Cabela's Sporting Goods store. He learned that the store had sold twelve of the relevant type of gun in about the past year. Walker was one of the people who had purchased a .30 carbine caliber gun at Cabela's. Police obtained a list of .30 caliber handguns registered with Washington State. Walker was on the State register as the owner of a Blackhawk. The Department of Licensing listed Walker as having an address less than half a mile away from the site of the Marysville shootings. A search of car registries revealed that Walker owned a black car, a 2006 Pontiac G6.

Officers located Walker's Pontiac G6 at a parking lot and observed that one of the headlights had recently been replaced. Behind the new headlight, the car's front panel was damaged and had paint transfer consistent with the accident with the Saturn.

Police obtained a warrant to arrest Walker and a warrant to search his home and car. In a custodial interview, Walker told detectives that on June 1 he went to The Irishmen Pub in Everett after work. He gave different accounts of where else he went that night, but eventually said that after leaving the pub he drove around Lake Stevens, visited a friend, and went to Marysville. Walker stated that he was the only one who had driven his car recently. He told the detectives that he owned firearms and that he was the only one who had fired them.

In executing the search warrant on Walker's home, officers found live .30 carbine caliber ammunition, spent shell casings, and two Ruger Blackhawks. Forensic analysis determined that all of the recovered bullets had been fired from Walker's guns, four from the older model Blackhawk and four from the newer model.

Detectives learned that Walker's father had replaced the headlight on Walker's car. The father had saved the damaged headlight and gave the part to police. The pieces of headlight recovered at the site of the hit and run were from Walker's car. The paint on Walker's car matched the paint transferred onto the Saturn.

Police obtained a surveillance video from a stretch of road near M.C.'s shooting. The video shows a group of girls walk by shortly after 11:00 p.m. At 11:12 p.m., the video shows a dark colored car drive the same stretch of road in the opposite direction. The dark car makes a U-turn and returns in the direction the girls were walking. Forensic video analysis determined that the car on the surveillance video was consistent with a 2006 Pontiac G6 and inconsistent with all other models of cars analyzed.

The State charged Walker with four counts of first degree assault, five counts of drive-by shooting, and first degree murder. He was convicted as charged for the assaults and drive-by shootings. The jury could not reach a verdict on first degree murder but found Walker guilty of first degree manslaughter.

## DISCUSSION

Custodial Statements

Walker first argues that detectives obtained his custodial statements in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and the trial court erred in denying the motion to suppress those statements.

A person who undergoes custodial questioning has the right not to incriminate himself. State v. Radcliffe, 164 Wn.2d 900, 905, 194 P.3d 250 (2008) (citing Miranda v. Arizona, 384 U.S. at 461). The State has the burden of showing, by a preponderance of the evidence, that a suspect understands his rights and has voluntarily waived them. Id. at 905-06 (citing Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The trial court's unchallenged findings of fact are verities on appeal. State v. Broadaway, 133 Wn. 2d 118, 131, 942 P.2d 363 (1997). We review the trial court's challenged findings of fact for substantial evidence and its conclusions of law de novo. State v. Garvin, 166 Wn.2d 242, 207, P.3d 1266 (2009).

The unchallenged findings of fact establish that Walker made no statements prior to his arrival at the sheriff's office. At the Sheriff's Office, Detective Pince read Walker his Miranda rights. After Pince read the Miranda warning, Walker asked "Well, is there an attorney present?" CP at 400-01; see Verbatim Report of Proceedings (11/14/2013) at 36. Pince replied that there was not, that he could get one, and that it would take a little while for an attorney to arrive. CP at 400-01. Walker then asked the detectives what this was about. Id.

The detectives replied that they wanted to explain but they needed to know Walker's decision as to whether he wanted to speak to them or not. Id. Walker said he was willing to talk to the detectives and agreed to a recorded interview. Id. Pince turned on the tape recorder and re-advised Walker of his rights. Id. Walker stated that he understood his rights and wanted to talk to the detectives. Id. Walker signed the Miranda waiver. Id. See Ex. 167. The detectives did not make any threats or promises that induced Walker to speak. Id.

The trial court concluded as a matter of law that Walker waived his rights knowingly and voluntarily, that he did not unequivocally request an attorney, and that the detectives did not act improperly in trying to determine whether Walker waived his rights before engaging in conversation. CP at 402-03.

Walker argues that the trial court erred in concluding that he did not unequivocally invoke his right to an attorney. App. Br. at 32. To invoke a Miranda right, a suspect must make an unequivocal request. In re Pers. Restraint of Cross, 180 Wn.2d 664, 682, 327 P.3d 660 (2014) (citing Miranda, 384 U.S. at 473-74). An invocation of Miranda rights is unequivocal if a reasonable officer in the same circumstances would understand it as an assertion of the suspect's rights. Id. (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Police are not required to clarify whether the suspect intends to assert the right. Id.

Washington courts have found an unequivocal assertion of the right to counsel where the suspect stated that he needed an attorney or had to speak with his attorney. State v. Nysta, 168 Wn. App. 30, 41-42, 275 P.3d 1162 (2012)

6

(holding that "'I gotta talk to my lawyer'" was an unequivocal request for an attorney) (quoting Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 290 (1987)); State v. Pierce, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012) (holding that "'I need a lawyer. I'm gonna need a lawyer because it wasn't me'" was an unambiguous invocation of the right to an attorney). But merely mentioning an attorney does not invoke the right. Radcliffe, 164 Wn.2d at 907-08 (citing Davis, 512 U.S. at 455) (holding that the statement "'maybe [I] should contact an attorney'" was equivocal and did not invoke the suspect's Miranda rights); State v. Gasteazoro-Paniagua, 173 Wn. App. 751, 755, 294 P.3d 857 (2013) (holding that "I guess I'll just have to talk to a lawyer about it" was an equivocal statement).

Walker made only one reference to an attorney during his custodial interrogation. When advised of his right to counsel, he asked "Well, is there an attorney present?" VRP (11/14/2013) at 36. Walker's question requested information about whether there was an attorney on the premises. The detective responded to this request by informing Walker that there was not an attorney present, that the detective could get one, and that it would take a little while for an attorney to arrive. Walker made no further reference to an attorney. We conclude that Walker did not unequivocally assert the right to counsel.

Walker argues, however, that his case is analogous to several federal and out of state cases in which the suspect asked "Can I have a lawyer?" See, e.g., United States v. Lee, 413 F.3d 622, 626 (7th Cir. 2005) (holding that the question "'Can I have a lawyer?'" was an unequivocal request for an attorney);

7

Commonwealth v. Hilliard, 270 Va. 42, 52, 613 S.E.2d 579, 586 (2005) ("'Can I get a lawyer in here?'"); Taylor v. State, 274 Ga. 269, 271, 553 S.E.2d 598 (2001) disapproved of by State v. Chulpayev, 296 Ga. 764, 770 S.E.2d 808 (2015) ("'Can I have a lawyer present when I do that [tell you what happened]?'"); State v. Dumas, 750 A.2d 420, 424 (R.I. 2000) ("Can I get a lawyer?" may be an unequivocal request for counsel). We reject Walker's argument. While "Can I get a lawyer?" may be a request for counsel, "Is there an attorney present?" is a request for information. See Dumas, 750 A.2d at 424 (holding that "'Can I get a lawyer?'" may be an unequivocal request for counsel but "'Do I need a lawyer?'" is a request for advice). The trial court did not err in concluding that Walker did not unequivocally assert the right to counsel.

Walker also argues that he did not knowingly waive his Miranda rights because he did not understand why he was being questioned. Walker urges this court to adopt the approach of Pennsylvania courts, which have held that a suspect must have knowledge of the specific crime under investigation in order to knowingly waive his rights. See, e.g., Commonwealth v. Brown, 341 Pa. Super. 138, 142, 491 A.2d 189 (1985) (holding that a suspect must "have knowledge of the particular transaction under investigation" to intelligently waive his rights).

Neither the United States Supreme Court nor Washington courts have adopted the Pennsylvania approach. In Colorado v. Spring, 479 U.S. 564, 107 S. Ct. 851, 858-59, 93 L.Ed.2d 954 (1987), the Supreme Court rejected the argument that a defendant's waiver of rights was not valid when the police failed to inform him that he would be questioned about a murder. Id. at 575-76. The

8

Spring court held that a waiver is knowing and intelligent when the suspect understands the basic privilege to remain silent. Id. at 574. There is no constitutional requirement that police inform a suspect of all information that could be useful in deciding whether to waive that privilege. Id. at 576.

Similarly, in State v. Owen, 13 Wn. App. 146, 534 P.2d 123 (1975), this court rejected the argument that a suspect did not knowingly waive his Miranda rights because he was never informed that he had struck a pedestrian and was being held for negligent homicide. Id. at 148. We held that informing the suspect of the nature of the charge under investigation is not a prerequisite for a valid Miranda waiver. Id. See also State v. Cushing, 68 Wn. App. 388, 393, 842 P.2d 1035 (1993) (citing State v. McDonald, 89 Wn.2d 256, 264, 571 P.2d 930 (1977) overruled on other grounds by State v. Sommerville, 111 Wn.2d 524, 530-31, 760 P.2d 932 (1988)), ("The test is whether a defendant knew that he had the right to remain silent, not whether he understood the precise nature of the risks of talking.").

We reject Walker's argument that his waiver was not knowingly given. Because Walker did not unequivocally request an attorney, and because he knowingly and voluntarily waived his Miranda rights, we conclude that the trial court did not err in denying Walker's motion to suppress his custodial statements.

Validity of Warrants

Walker next argues that the trial court erred in denying his motion to suppress evidence obtained through executing search warrants. He contends

9

that the June 28 warrant to search Walker's home and car was not supported by probable cause.

A search warrant may only issue if the underlying affidavit shows probable cause. State v. Jackson, 150 Wn.2d 251, 264, 76 P.3d 217 (2003) (citing State v. Gore, 143 Wn.2d 288, 296, 21 P.3d 262 (2001)). Probable cause exists where the affidavit includes facts sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the criminal activity is likely to be found in the place to be searched. Id. (citing State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002)). The affidavit is examined in a common sense manner. Id. at 265. The facts in the affidavit are viewed in combination, not standing alone. State v. Dunn, 186 Wn. App. 889, 897, 348 P.3d 791 (2015), rev. denied, 184 Wn.2d 1004, 357 P.3d 665 (2015) (citing State v. Garcia, 63 Wn. App. 868, 875, 824 P.2d 1220 (1992)). Whether the facts in the affidavit support probable cause is a question of law that this court reviews de novo. State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008) (citing State v. Chamberlin, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007)).

Walker argues that the June 28 warrant affidavit only established probable cause that he had been involved in a hit and run collision. He contends that the search of his home was not justified because there was no reason to infer that evidence of the hit and run would be found at his home.

The June 28 affidavit describes the time and location of each of the shootings and the proximity of the sites to one another. The affidavit also contains the following facts: Two of M.C.'s friends stated that the fatal shot was

10

fired from a dark colored car. A dark colored passenger car was captured on video making a U-turn and driving in the direction of the girls shortly before M.C. was shot. Several witnesses to other shootings believed the shot was fired from a car. A witness saw a dark car slowly pass by shortly before shots were fired. A car driving away from the site where shots had just been fired collided with a parked car. The striking car was black and sustained damage to its headlight.

The affidavit additionally states: Bullets recovered from five of the drive-by shootings were all .30 carbine caliber. The Marysville bullets were fired by the same gun, the Lake Stevens bullets were fired by the same gun, and all of the bullets may have been fired by the same gun. Walker had recently bought a Blackhawk revolver at Cabela's. The Washington State handgun registry listed Walker as the owner of a Blackhawk revolver. Walker's facebook page showed him with multiple firearms, including two .30 carbine caliber weapons.

The affidavit continues with the following facts: The Department of Licensing listed Walker as having a Marysville address about half a mile away from the last drive by shooting. Walker was the registered owner of a black passenger car, a Pontiac G6. Police observed Walker's Pontiac G6 at a parking lot. The car had recent damage consistent with the hit and run.

From the facts in the affidavit, a reasonable person could infer that all of the shots were fired from a black passenger car and that the same car was involved in a hit and run collision. The facts lead to the inference that Walker's car was probably the one involved. A reasonable person could also infer that evidence of the crime such as firearms, ammunition, casings, auto parts, and

receipts showing Walker's location would likely be found in Walker's home or car. We conclude that the June 28 warrant to search Walker's home and car was supported by probable cause. The trial court did not err in denying Walker's motion to suppress evidence obtained through execution of the June 28 warrant.

Walker also argues that the July 2 warrants authorizing search of his cell phone, phone records, and bank records were invalid. He first argues that the supporting affidavits rely on custodial statements that were obtained in violation of Miranda. He asserts that the custodial statements are fruit of the poisonous tree and must be excised from the warrant affidavit. But as discussed above, Walker waived his Miranda rights and his custodial statements were lawfully obtained. The trial court did not err in considering Walker's custodial statements in the warrant affidavits.

Walker next argues that the July 2 warrants were overbroad. A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. State v. Keodara, 191 Wn. App. 305, 312, 364 P.3d 777 (2015) rev. denied, 185 Wn.2d 1028 (2016) (citing State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003)). The particularity requirement serves to prevent exploratory searches, to limit the executing officer's discretion in determining what to seize, and to prevent warrants issued on vague bases of fact. State v. Perrone, 119 Wn.2d 538, 545-48, 834 P.2d 611 (1992). A description generally satisfies the particularity requirement "if it is as specific as the circumstances and the nature of the activity under investigation permits." Id. at 547 (citing United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985)). However, where materials

12

protected by the First Amendment are to be searched, the degree of particularity demanded is greater than where the items to be searched are outside of First Amendment protection. Id.

Walker asserts that the July 2 warrant authorizing search of his bank records was overbroad. The warrant authorized search of "[a]ny and all bank/credit union account information . . . ." since the inception of Walker's account. The State concedes that the warrant was overbroad but argues that any error in admitting evidence obtained from Walker's bank records was harmless. Walker does not address this argument.

Admitting evidence obtained through an overbroad warrant is an error of constitutional magnitude. Keodara, 191 Wn. App. at 317 (citing State v. Contreras, 92 Wn. App. 307, 318, 966 P.2d 915 (1998)). The State has the burden to show that the error was harmless beyond a reasonable doubt because "'any reasonable jury would have reached the same result without the error.'" Id. (quoting State v. Jones, 168 Wn.2d 713, 724, 230 P.3d 576 (2010)).

At trial, Detective Wells testified to the evidence obtained from the bank records. The bank records showed that Walker purchased gas in Lake Stevens at 12:09 a.m. on June 1, nearly 24 hours before M.C. was shot. The records also showed transactions corresponding with receipts showing that Walker made purchases at The Irishmen, Jimmy John's, and Gordito's between June 1 and June 4. Wells stated that the bank records reflected the date each transaction was posted, not when it actually occurred. The receipt from The Irishmen showed

that Walker was there the evening of June 1. The corresponding transaction on the bank records was posted June 3.

The State argues that the only relevant evidence obtained from the bank records was that Walker was at The Irishmen. The State asserts that this evidence was cumulative because Walker admitted going to The Irishmen on June 1, a receipt admitted into evidence showed that he was there that evening, and the bartender confirmed seeing Walker at the pub. We agree. The evidence obtained from Walker's bank records had minimal relevance and was cumulative. We conclude that, although the July 2 warrant for Walker's bank records was overbroad, any error in admitting the evidence obtained from the warrant was harmless.

Walker next argues that the July 2 warrant authorizing search of his cell phone was overbroad and evidence obtained through that warrant should have been suppressed. The July 2 warrant for Walker's smartphone authorized search for any inquiries or searches concerning auto parts and collision repair; any internet access or searches; any and all stored contacts including name and telephone number; any and all digital images; any and all stored digital video files; and any and all stored emails. These search items were not limited in duration. The warrant also authorized search for stored data indicating the location of the phone on June 1 and 2, 2013; call logs for June 1-28, 2013; and stored text messages from June 1-28, 2013. CP at 379.

The State concedes that those portions of the warrant that are unlimited in duration are overbroad, but argues that the time-limited portions of the warrant

14

are valid under the doctrine of severability. Walker argues that severability does not apply.

For severability to apply, five requirements must be met: (1) the warrant must lawfully have authorized entry into the premises; (2) the warrant must include one or more particularly described items for which there is probable cause; (3) the part of the warrant that includes particularly described items supported by probable cause must be significant when compared to the warrant as a whole; (4) the searching officers must have found and seized the disputed items while executing the valid part of the warrant; and (5) the officers must not have conducted a general search in disregard of the warrant's scope. Maddox, 116 Wn. App. at 807-09.

Walker argues that the warrant to search his phone does not meet the third requirement because the time-limited portions of the warrant are insignificant as compared to the warrant as a whole. He argues that this is especially true considering the more demanding standard that applies to items protected by the First Amendment.

In describing the "significance" requirement, the Maddox court considered whether a warrant authorizes a general search so that even items described with particularity are tainted by the unlimited language. Id. at 807-08. The Maddox court cites to Perrone. Id. at 809. In that case, the warrant authorized a search for a long list of items and combined valid and invalid items in the same phrases. Perrone, 119 Wn.2d at 543 (authorizing, for example, seizure of "photographs, movies, slides, video tapes, magazines or drawings of children or adults engaged

in sexual activities or sexually suggestive poses"). The court held that the warrant would require extensive editing to render it valid, there were no provisions that were valid without such editing, and the warrant as written allowed the executing officer so much discretion that it amounted to a general warrant. Id. at 559-60.

The warrant in this case is not like that in Perrone. Here, each provision is clearly divisible from the other and the overbroad provisions are invalid because of the impermissible duration of the search, not because of the nature of the intrusion. See Maddox, 116 Wn. App. at 809 (applying severability where the overbroad provisions concerned the "intensity and duration of the search" and not the "intrusion per se") (quoting Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). We conclude that the parts of the warrant that describe with particularity items supported by probable cause are significant and severability applies. Thus, evidence obtained from the valid portions of the warrant was properly admitted. However, the trial court erred in denying the motion to suppress as to evidence obtained from the overbroad portions of the warrant. We thus consider whether admission of that evidence was harmless.

The State introduced evidence from both the valid and the invalid portions of the warrant. Detective Quick testified to the evidence recovered from Walker's cell phone. He stated that on the night of June 1- June 2, no phone calls were made between 9:41 p.m. and 2:04 a.m. A few texts were sent and received in that time period. The texts concerned the possibility of getting something to eat. Quick stated that at 10:51 p.m. the phone's user conducted a Google Maps search for a housing area in Lake Stevens. There was no internet history on

16

Walker's phone prior to June 18. Then, there were five visits to websites covering the M.C. killing.

The State concedes that the trial court erred in admitting the statements concerning the Google Maps search, the lack of internet history, and the websites covering M.C.'s death because these were obtained pursuant to overbroad provisions of the warrant. The State contends that the error was harmless because the lack of internet history was immaterial and the Google Maps search and visits to websites reporting on M.C.'s death were cumulative. We agree.

At trial, the State introduced Walker's custodial statements, in which he admitted driving around Lake Stevens on June 1, stated that he did not know the streets there well, and stated that he used his phone to search for directions. Walker also admitted using his phone to visit websites covering M.C.'s death. Both the State and Walker introduced evidence that it could not be determined whether the lack of internet history prior to June 18 was due to a setting on the phone or due to the user deleting history.

We conclude that evidence of the Google Map search and visits to news websites was cumulative. And the evidence that there was no internet history on the phone prior to June 18 was immaterial. Although the trial court erred in admitting evidence obtained from the overbroad warrant provisions, the error was harmless.

Walker also appears to assert that the July 2 warrant authorizing search of his cell phone records was overbroad. However, he presents no argument

concerning this warrant. In the absence of argument, Walker waives the issue. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

We conclude that the June 28 warrant for Walker's home and car was supported by probable cause. The July 2 warrant for Walker's bank records was overbroad but, because the evidence obtained from those records was immaterial, the error in admitting that evidence was harmless. The July 2 warrant for Walker's cell phone contained overbroad provisions, but the evidence obtained pursuant to those provisions was also immaterial and its admission was harmless.

Limits on Cross Examination

Next, Walker argues that the trial court erred in limiting his cross examination. A defendant's right to confront witnesses through cross examination is protected by both the federal and state constitutions. State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). Cross examination serves to test the perception, memory, and credibility of witnesses. Id. (citing State v. Parris, 98 Wn.2d 140, 144, 654 P.2d 77 (1982)). The rules of evidence apply to cross examination. Id. at 624. The trial court may limit the scope of cross examination if the evidence sought is vague, argumentative, or irrelevant. Id. at 620. We review the trial court's decision on the scope of cross examination for abuse of discretion. Id. at 619. We will not disturb the trial court's evidentiary ruling unless the ruling is manifestly unreasonable or based on untenable grounds. In re

Personal Restraint of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009) (citing Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)).

Walker asserts that the trial court improperly limited his cross examination of two State witnesses. On direct examination, David Northrop, the Marysville crime lab supervisor, primarily testified to why the crime lab does not conduct testing for gunshot residue. He also described the process of peer review and stated that every case processed at the lab undergoes peer review. Walker questioned Northrop about whether errors occurred at the crime lab and how errors occurred despite quality assurances such as peer review. Northrop testified to mistakes that had occurred at the Marysville crime lab and of which he had personal knowledge. Northrop stated that he was aware of rumors that errors may have occurred at other crime labs but stated that he had no personal knowledge of those cases. The court did not allow Walker to question Northrop about specific instances of error at other crime labs about which Northrop had no direct knowledge.

Brian Smelser, a crime lab analyst, testified to ballistic evidence. Smelser also summarized his experience and briefly stated that before joining the ballistics department he had worked in biological analysis, including DNA. Walker cross examined Smelser at length. Walker questioned Smelser about whether he had followed proper procedures at the crime lab. A large part of Walker's cross examination concerned DNA evidence, although there was no DNA evidence in this case. The trial court upheld the State's objection to questions concerning an incident of DNA cross-contamination involving Smelser that allegedly occurred

several years previously. The court held that the incident was remote in time, concerned a different discipline, occurred when DNA analysis was a new field, and was ultimately irrelevant to Smelser's current work analyzing ballistics.

Walker confronted both Northrop and Smelser through cross examination. The trial court's limits on the extent of Walker's cross examination were not based on untenable grounds and were not manifestly unreasonable. We conclude that the trial court did not abuse its discretion.

Demonstrative Evidence

Walker next challenges the trial court's admission of demonstrative evidence. At trial, Detective Wells testified that he conducted a demonstration to determine if it was possible for a shot fired from the passenger window of Walker's car to strike M.C. at the location of her entry wound. Wells stated that he used the height difference between M.C.'s entry and exit wounds to calculate the angle at which the bullet struck her. He had a detective drive Walker's car on South Lake Stevens Road and had models, including one that was the same height as M.C., represent the girls walking on the side of the road. Photos from the demonstration show the relative location of an oncoming vehicle to pedestrians on the side of the road. The photos also show that a shot fired from the car could have struck a pedestrian of M.C.'s height at the indicated angle.

Walker objected to the admission of the testimony and photographs, arguing that the demonstration was merely speculative. After hearing argument on the issue, the trial court concluded that the demonstrative evidence was admissible. The trial court admitted the photos with the instruction that the photos

did not depict the actual events of the crime charged, served only to illustrate Wells's testimony, and would not go to the jury room with the substantive evidence. Walker cross-examined Wells concerning possible differences between the demonstration and the actual events. Wells acknowledged that many facts about M.C.'s shooting were unknown, the demonstration did not prove that the shot was fired from Walker's car, and the demonstration did not rule out other possibilities.

Walker argues that the trial court erred in admitting Wells's testimony and the photos of the demonstration. He asserts that the State failed to show that the demonstration was substantially similar to what occurred on the night M.C. was killed. Walker also argues that the photos were unduly prejudicial and served no purpose other than to appeal to the jurors' emotions.

Demonstrative evidence is permitted "if the experiment was conducted under substantially similar conditions as the event at issue." State v. Finch, 137 Wn.2d 792, 816, 975 P.2d 967 (1999) (citing Jenkins v. Snohomish County Pub. Util. Dist. No. 1, 105 Wn.2d 99, 107, 713 P.2d 79 (1986)). Determining whether the similarity is sufficient is within the discretion of the trial court. Id. If the evidence is admitted, any lack of similarity goes to the weight of the evidence. Id. We review the trial court's evidentiary ruling for abuse of discretion and will only disturb the ruling if it is manifestly unreasonable or based on untenable grounds. In re Duncan, 167 Wn.2d at 402. A ruling is manifestly unreasonable if it "'adopts a view that no reasonable person would take.'" Id. (quoting Mayer, 156 Wn.2d at 684).

21

Walker relies on several cases in which a videotaped reenactment of a crime was held inadmissible due to the failure to establish that the video was substantially similar to the actual events and the risk of prejudice from inflammatory images. See, e.g., State v. Stockmyer, 83 Wn. App. 77, 920 P.2d 1201 (1996); Dunkle v. State of Oklahoma, 2006 OK CR 29, 139 P.3d 228 (2006); Eiland v. State, 130 Ga.App. 428, 203 S.E.2d 619 (1973)). The State argues that Walker's cases concerning reenactments are inapposite. It asserts that the demonstrative evidence in this case is analogous to that considered in Finch. We agree with the State.

In Finch, a shot fired from inside a residence through the bedroom window struck and killed an officer who was outside the residence. Finch, 137 Wn.2d at 803. The State's theory was that the shot was intentional and premeditated. Id. During the investigation, police conducted a demonstration to show that the suspect could have seen the officer through the bedroom window. Id. at 804. Investigators attempted to recreate lighting conditions, placed officers in the same positions as the officers who were at the scene, and used a video camera to record what could be seen from the bedroom window. Id. The trial court admitted the video and the investigators' testimony concerning the demonstration. Id. at 815. The court ruled that the evidence was helpful to the jury and that any differences in the conditions portrayed in the video and those on the night of the crime went to the weight of the evidence and could be adequately addressed through cross examination. Id.

22

The Supreme Court upheld the trial court's ruling. Id. at 818. The Finch court distinguished the video demonstration in that case from the video reenactment in Stockmyer. The video in Stockmyer purported to reenact a fight that culminated in a shooting.[2] Stockmyer, 83 Wn. App. at 82. The video in Finch was not a reenactment of the crime and did not carry the same potential for prejudice as the Stockmyer video. Finch, 137 Wn.2d at 817. The Finch court held that the demonstrative evidence was created in conditions substantially similar to those on the night in question and that any differences were brought out during questioning. Id. at 818. It further held that the probative value of the evidence was not outweighed by prejudice to the defendant. Id.

The present case is analogous to Finch. The photos and testimony concern a demonstration that showed that the State's theory of the case was possible. The photos do not reenact the shooting and their emotional impact is minimal. Differences between the demonstration and the actual events were addressed in cross examination. We conclude that the trial court did not abuse its discretion in admitting the evidence.

First Degree Murder

Next, Walker argues that the trial court erred in allowing the State to submit the charge of first degree murder to the jury. A court must instruct the jury on a party's theory of the case if there is sufficient evidence to support the theory.

---

[2] The video in Stockmyer was ruled inadmissible based on factual inaccuracies, the inability to adequately cross examine the editing and film speed, and the potential for prejudice. Stockmyer, 83 Wn. App. at 83.

State v. Williams, 132 Wn.2d 248, 259, 937 P.2d 1062 (1997) (citing State v. Hughes, 106 Wn.2d 176, 191, 721 P.2d 902 (1986)). Evidence is sufficient if, viewed in the light most favorable to the State, any reasonable trier of fact could find guilt beyond a reasonable doubt. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016) (citing State v. Green, 94 Wn.2d 216, 616 P.2d 628 (1980)).

Direct and circumstantial evidence are equally reliable. Washington v. Farnsworth, __ Wn.2d __, 374 P.3d 1152, 1156 (2016) (citing State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). "'[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation.'" Rich, 184 Wn.2d at 903 (quoting State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013)). "'An inference is a logical conclusion or deduction from an established fact.'" Lamphiear v. Skagit Corp., 6 Wn. App. 350, 356, 493 P.2d 1018 (1972) (quoting Martin v. Insurance Co., of North America, 1 Wn. App. 218, 221, 460 P.2d 682 (1969)).

Walker asserts that the evidence was not sufficient for the jury to reasonably infer that Walker committed murder. He concedes that the State proved that Walker fired shots in Lake Stevens and Marysville in the early morning of June 2, but he asserts that there was no basis for a reasonable finder of fact to infer that Walker fired the shot that killed M.C. We disagree.

The State presented evidence that the shot that killed M.C. was fired from a dark-colored car; Walker's car was in the vicinity; Walker drove by the girls, made a U-turn, and returned in their direction; Walker's car was linked to one of the other drive-by shootings; the eight bullets recovered were all fired from

Walker's guns; no bullet casing was found at the scene of M.C.'s shooting or at any of the other sites; all of the targets were unrelated and apparently random; and each of the shootings involved a single shot at a single target. From these facts a reasonable trier of fact could infer that Walker fired the shot that killed M.C. The trial court did not err in instructing the jury in the charge of first degree murder.

## Statement of Additional Grounds

In a statement of additional grounds, Walker first asserts that the trial court erred in limiting his cross examination of Michael Cavenaugh. This court reviews a trial court's evidentiary decisions for abuse of discretion. Duncan, 167 Wn.2d at 402.

Cavenaugh lived in one of the houses shot in the early morning of June 2, 2013. In April 2013, Cavenaugh had reported to police that armed men approached his house looking to collect a debt from a houseguest. The men, who were white, arrived in a purple PT Cruiser. Walker, who is black, was not one of the men who visited Cavenaugh's home in the April incident. During the investigation after the June shootings, police found both a Marysville and a Camano Island address associated with Walker. At the Camano Island address, a purple PT Cruiser was visible. The PT Cruiser was registered to Walker's father.

The State moved in limine to exclude the April 17 incident as evidence that another suspect committed the crime. The State argued that there were no circumstances linking the two events and that evidence of the April 17 incident

would be confusing and irrelevant. The trial court granted the motion over Walker's objection. The court affirmed its ruling at trial.

In making its decision, the trial court relied on State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932). The Downs court held that evidence of another suspect is admissible if there is a "train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party." Id. On the other hand, acts that are "disconnected and outside of the crime itself" are not admissible as evidence of another suspect. Id. The trial court determined that there was no evidence indicating a link between the April and the June incidents and the earlier incident was not relevant to the June shooting.[3]

The trial court did not abuse its discretion. The evidence of the April 17 incident did not clearly point to another suspect and was unrelated to the crime charged. The trial court's decision is not manifestly unreasonable and is based on proper grounds.

Walker next argues that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a Brady violation, Walker must show that (1) the evidence was favorable to him, (2) the State suppressed the evidence, and (3) he was prejudiced by the suppression of evidence. State v. Mullen, 171 Wn.2d 881, 895,

---

[3] As a recent case from our Supreme Court, State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014) observed, "[t]he Downs test in essence has not changed: some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime[,]" in order for the evidence to be admissible. Here, Walker fails to establish the necessary link.

259 P.3d 158 (2011) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Walker asserts that the State suppressed a sketch of the car seen at the site of M.C.'s killing. During an interview with Detective Thomas, one of the girls walking with M.C. attempted to describe the car. M.H. described the car as an older, small, compact, four-door, black car with a flat hood and stacked headlights. Thomas tried to sketch her description on his note pad. Thomas stated that the sketch was destroyed with his other notes and was never delivered to the lead investigator or the prosecutor's office. Walker has not shown that the sketch was favorable to him or that he was prejudiced by the suppression. He thus fails to establish a <u>Brady</u> violation.

Walker also argues that the trial court erred in admitting his custodial statements. But because Walker's counsel addressed this issue we do not consider it further.[4]

Affirmed.

WE CONCUR:

---

[4] Walker also provides additional support for his counsel's arguments concerning the validity of the search warrants, the limits on cross examination, and the admission of demonstrative evidence. To the extent his arguments are relevant, they are essentially the same as those raised by his attorney and do not change our resolution of those issues.