IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86212-0-I (consolidated with No. 86221-9-I) |
| Respondent, | |
| v. | DIVISION ONE |
| FRANCISCO LOPEZ CRUZ, JR., ANDY E. CASTAÑEDA RODRIGUEZ, AND EACH OF THEM, | UNPUBLISHED OPINION |
| Appellants. | |

HAZELRIGG, C.J. — Francisco Lopez Cruz and Andy Castañeda Rodriguez[1] appeal from the judgments entered after a joint jury trial. The jury convicted them both of one count of premeditated murder in the first degree, one count of murder in the second degree, and two counts of assault in the first degree, with corresponding firearm enhancements on each count, for a shooting incident.[2] In this consolidated appeal, they contend that the trial court abused its discretion as to certain evidentiary rulings. Lopez also avers that the prosecutor committed

---

[1] We refer to the defendants in the manner by which they self-identified in the trial court. Thus, we follow traditional Latine naming practices and use the patrilineal portion of their last names with the proper diacritical marks consistent with the Spanish-language origins of their names. *See* Robert S. Chang, Cecily C. Hazelrigg, Linda C.J. Lee, *"That's Not My Name": The Linguistic Violence of Misnaming Parties in Court Proceedings*, 100 WASH. L. REV. 687 (2025).

Relatedly, we have modified all quotations from the record, including pleadings, testimony, and evidence, to reflect the proper spelling of Castañeda's name.

[2] Lopez was also convicted of one count of unlawful possession of a firearm in the first degree for the same incident reached by jury verdict in the second stage of the bifurcated portion of the trial and one count of assault in the third degree for a separate shooting on March 10, 2020, on which he entered a guilty plea.

Castañeda also entered a guilty plea on one count of assault in the second degree for the March 10 shooting.

misconduct during closing argument, and Castañeda asserts the trial court erred when it relied on his juvenile convictions in calculating his adult offender score. Lopez further requests that this matter be remanded for the trial court to vacate the jury verdict convicting him of murder in the second degree, which the State does not contest as to either appellant. We accept the State's concession but conclude that Lopez and Castañeda do not otherwise establish entitlement to appellate relief. Accordingly, we affirm but remand for vacatur of the convictions for murder in the second degree.

FACTS

The prosecution in this matter arose from two shootings in separate locations in Kent that involved a particular semiautomatic firearm and occurred eight days apart in March 2020. Andy Castañeda Rodriguez and Francisco Lopez Cruz were implicated in both incidents. On March 10, according to the State's probable cause affidavit, Lopez and Castañeda approached the occupants of a car parked at the entrance to a mobile home park and instigated an altercation with them. During the incident, the State alleged, Castañeda fired several bullets from a 9 mm semiautomatic handgun and struck one of the individuals in the arm and thigh before he and Lopez fled on foot. The altercation was recorded by a surveillance video camera located near the mobile home park. Subsequent law enforcement investigation by the Kent Police Department (KPD) recovered five spent 9 mm bullet casings from the scene.

The State's affidavit further alleged that eight days later, on March 18, Castañeda was driving a dark gray Audi sedan, with Lopez in the front passenger

seat, past a small city park where they spotted an individual named José DeSantiago Perez[3] along with two other individuals. After circling the neighborhood for 26 minutes, Lopez exited the Audi, fired several bullets from a 9 mm semiautomatic handgun toward DeSantiago Perez, re-entered the car, and Castañeda drove them away.

One of the individuals with DeSantiago Perez dialed 911, and KPD officers equipped with body-worn video cameras (bodycams) later arrived at the scene. Their bodycams recorded their conversations with witnesses as well as their interactions with and observations of DeSantiago Perez, who was lying face down, unresponsive, and struggling to breathe, with a single gunshot wound to his head. He was transported to emergency care and admitted in critical condition but died the next day.

A search of the city park located six spent 9 mm casings. A subsequent tool mark analysis conducted by the Washington State Patrol Crime Laboratory compared the casings recovered in the mobile home park to those recovered in the city park. The analysis resulted in a determination that all of the casings had been fired from the same 9 mm semiautomatic firearm, likely a "Hi-Point" brand gun.

Law enforcement investigation in the days following the March 18 shooting between the KPD, Auburn Police Department (APD), and Des Moines Police Department resulted in the arrests of Castañeda and Lopez. The information obtained from the preliminary investigation, along with further evidence obtained

---

[3] Because his name preference is unknown, we refer to the decedent by his complete last name.

incident to their arrests, resulted in, among other things, a postarrest photograph taken by police of a tattoo on Castañeda's left hand depicting the words "UL Santos," a still image showing a left hand with the same tattoo holding a Hi-Point brand semiautomatic firearm with an extended magazine, and other text messages, audio recordings, video recordings, and meta-data collected from both defendants' Snapchat[4] and Facebook[5] accounts and cell phones.

The investigation also uncovered that earlier in the day on March 18, Castañeda had driven by two residences and picked up three individuals, Sheccid Mariscal Bernal,[6] Lyndseyl Osorio, and Vanessa Osorio,[7] who were in the back passenger seats before, during, and after the shooting that day. As pertinent here, Mariscal Bernal had not met Lopez beforehand, was introduced to him that night only by the name "Evil," and noticed that he was carrying a semiautomatic firearm with an extended magazine.

On June 10, the State filed an information jointly charging Lopez and Castañeda with one count of assault in the first degree for the March 10 shooting, with Castañeda to be prosecuted as the principal and Lopez as his accomplice. For the March 18 shooting, the information jointly charged them with one count of murder in the first degree and two counts of assault in the first degree, with Lopez as the principal and Castañeda as his accomplice. The information contained

---

[4] Snapchat is an Internet-based multimedia messaging application that allows users to edit and send photos and videos to other users, both privately and publicly.

[5] Facebook is an Internet-based social media and social networking service that allows users to send messages to one another.

[6] We refer to Mariscal Bernal by both parts of her last name consistent with how she set out her name at trial.

[7] Because Lyndseyl and Vanessa Osorio share the same last name, we refer to them by their first names as needed for clarity. No disrespect is intended.

special allegations that each of the foregoing crimes was committed while armed with a firearm. The State further charged Castañeda with one count of unlawful possession of a firearm in the first degree (UPF1) for the March 10 shooting and Lopez with one count of UPF1 for the March 18 shooting.[8]

By September 2023, trial was set for early October. Castañeda's trial brief indicated that the nature of his defense was general denial, while Lopez' trial brief did not expressly identify the nature of his defense. The defendants indicated that they wished to join one another's motions and objections going forward, which the court acknowledged. Thereafter, between September 18 and October 3, the parties engaged in eight days of pretrial litigation.

Around this time, the State filed an amended information reiterating the above charges and adding one count of murder in the second degree against both defendants for the March 18 shooting of DeSantiago Perez. Following arraignment on the amended information, defense counsel represented that their trial defense was expected to be a hybrid of general denial and self-defense.

The defendants moved to sever the State's charges relating to the March 10 shooting from those arising from the March 18 shooting and to bifurcate the UPF1 charges relating to each shooting from the trials on the proposed severed charges. The court granted the defense motions. As a result, the charges against Lopez and Castañeda for the first stage of the bifurcated trial were the joint charges

---

[8] The State alleged that Castañeda had a juvenile conviction for unlawful possession of a firearm in the second degree from King County Superior Court that disqualified him from lawful possession of a firearm. The State alleged that Lopez had previously been convicted in King County Superior Court of robbery in the first degree, which resulted in the loss of his right to possess a firearm.

against them for the March 18 shooting: one count of premeditated murder in the first degree, one count of murder in the second degree, and two counts of assault in the first degree, all carrying firearm enhancements.

In addition, the court heard and considered extensive argument from the parties regarding the admissibility of the State's proposed evidence gathered from the law enforcement investigations. As part of these proceedings, although the State initially indicated that it was planning to introduce such evidence to show the charged crimes were motivated by the defendants' alleged gang affiliation, the prosecutor represented that the State no longer intended to do so and it would not introduce evidence at trial for that purpose. The court later issued numerous rulings in limine as to the State's proposed evidence and the purposes for which it was offered. Three days before trial, defense counsel indicated they were not intending to present a theory of self-defense for the March 18 charges.

On October 5, the first stage of the bifurcated trial commenced. The prosecutor told the jury in opening statements that the State's theory of the case was that on March 18, Lopez and Castañeda worked in concert with one another to use a semiautomatic firearm to murder the decedent with premeditated intent and intentionally assault two other victims. Counsel for Lopez and Castañeda each stated that their theory of the defense was that although they did not dispute that Castañeda drove himself and Lopez to the city park or that Lopez fired bullets from a handgun, one of which killed the decedent, the evidence would only show that Lopez did so recklessly, without intending or planning to kill anyone.

Between October 5 and November 1, the State presented its case in chief over 11 days. Due to scheduling issues, co-counsel for Castañeda called two witnesses before the State rested, including an expert in the field of human memory to challenge Mariscal Bernal's testimony. Counsel for Lopez did not present witness testimony to the jury. Neither Lopez nor Castañeda testified. The jury later returned verdicts convicting the defendants as charged for the joint counts arising from the March 18 incident.

The second stage of the bifurcated trial on the State's UPF1 count against Lopez followed immediately thereafter. Lopez stipulated to the fact of his prior felony conviction, and the jury later returned a verdict convicting him as charged. Later still, the parties resolved the remaining charges by plea agreement; the State agreed to dismiss the UPF1 charge in exchange for Castañeda's guilty plea to one count of assault in the second degree for the March 10 shooting, and Lopez entered a guilty plea to assault in the third degree for the same incident.

As to Lopez, the court imposed a total term of confinement of 574 months in prison. It imposed a total term of confinement of 451 months in prison on Castañeda. Both sentences included mandatory consecutive time for the firearm enhancements.

They timely appealed, and their cases were consolidated by a commissioner of this court.

ANALYSIS

I. Pretrial Evidentiary Rulings

Lopez and Castañeda first contend that the trial court abused its discretion when it issued certain rulings on the admissibility of the State's proposed evidence to be relied on at trial. The appellants do not establish an abuse of discretion as to any of the challenged evidentiary rulings.[9]

A. Legal Standard and Standard of Review

Trial courts determine whether evidence is relevant and admissible, and appellate courts review the trial court's rulings for abuse of discretion. *State v. Brockob*, 159 Wn.2d 311, 348, 150 P.3d 59 (2006). A trial court abuses its discretion if "'no reasonable person would take the view adopted by the trial court.'" *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001) (internal quotation marks omitted) (quoting *State v. Ellis*, 136 Wn.2d 498, 504, 963 P.2d 843 (1998)).

The trial court issued the rulings in question under ER 401, 403, and 404(b). ER 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 403 states, in pertinent part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not

---

[9] The appellants' briefing rely extensively on their trial counsels' opening statements, their stipulation, and the testimony and exhibits provided at trial to support their challenge to the pretrial rulings in limine. Their reliance is unavailing. Such statements, stipulation, and evidence are immaterial to the appellants' assignments of error to the trial court's *pretrial* rulings on the *proposed evidence* before the court.

admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." According to our Supreme Court, in order to properly admit such evidence under ER 404(b),

> "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Thang,* 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). There is a presumption that evidence of prior misconduct is inadmissible, and it is the burden of the party seeking to introduce such evidence to satisfy the first three factors. *Id.* The fourth factor ensures that the proffered evidence does not run afoul of ER 403. *Id*. "This analysis must be conducted on the record." *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

B.      State's Proposed Evidence and Pretrial Theory of the Case

Prior to trial, the State's theory of the case for the March 18 joint charges was that Castañeda provided his semiautomatic firearm to Lopez and drove him in his car to the small city park where Lopez fired bullets from that firearm at the group that included DeSantiago Perez, which resulted in his death by a single gunshot wound. During the pretrial litigation phase, although defense counsel either indicated a willingness to stipulate to the defendants' "identity" for those charges or argued that the defendants' "identity" for the shooting was not disputed,

they did not indicate a willingness to stipulate that Castañeda provided Lopez with the semiautomatic firearm used on March 18 or that the firearm was the same as the one used by Castañeda for the March 10 shooting.[10]

The State represented to the court that it had only circumstantial evidence to establish that Castañeda lent Lopez his semiautomatic firearm that Lopez then used for the March 18 shooting. The State sought to prove the sharing of the firearm by establishing that Castañeda had possession, control, and use of that firearm before and after the March 18 shooting. Accordingly, the State sought to introduce surveillance camera footage showing that Castañeda had fired a semiautomatic firearm alongside Lopez for the March 10 shooting, still images from Castañeda's Snapchat account and cell phone time-stamped *after* the March 18 shooting depicting a left hand with tattoos identical to Castañeda's holding a firearm identical to the one that Lopez used in the March 18 incident, and a report on the toolmark analysis of the fired bullet casings collected from the scenes of the March 10 and March 18 shootings indicating that they had been fired from the same model of semiautomatic firearm as depicted in the still images.

With regard to proof of its case against Lopez for the March 18 shooting, the State again indicated that its proposed evidence was largely circumstantial. Mariscal Bernal, the State's central witness, was anticipated to testify that she had been in the back seat of the car before, during, and after the shooting that day and observed a gun resembling the one in question in possession of a male individual

---

[10] For instance, during these proceedings, counsel for Lopez discussed the possibility of stipulating to Lopez' identity in order to connect certain evidence to him, but the State responded that "a stipulation, in order for the State being willing to accept it, would go far beyond what [counsel for Lopez] would be willing to accept."

in the front passenger seat of the Audi who had been introduced to her only by the name "Evil." Therefore, in order to support that portion of Mariscal Bernal's testimony, the State planned to present the following evidence, discussed in more detail *infra*: still images taken from Lopez' Snapchat account indicating that his username was "Evil_Loko," a time- and location-stamped Facebook conversation between Castañeda and Lyndseyl from earlier in the day on March 18, before the shooting, in which she told Castañeda to "[t]ell evil to message nessa on Snapchat," and a photograph of the inside cover of an address book seized from Lopez' residence that was inscribed as belonging to "Loksero Evil." With this context in mind, we review the proposed evidence, the trial court's rulings regarding its admissibility, and the appellants' challenges thereto.

## C. March 10 Surveillance Camera Footage

First, the appellants contend that the trial court abused its discretion when it ruled pretrial that surveillance footage of the March 10 shooting was admissible to connect Castañeda and the semiautomatic handgun in question to the March 18 shooting. The trial court did not err.

### 1. State's Proposed Evidence

Here, the proposed footage was a roughly three-and-a-half-minute video recording obtained from a surveillance video camera inside the mobile home park showing, as alleged by the State, Castañeda and Lopez approaching and confronting several individuals inside of a car. As described by the State, although the "firearm itself does not appear" in the footage,

- 11 -

> [w]hat you see that indicate there is a gun are two things: One, you see some muzzle flashes, and you see Mr. Casta[ñ]eda []Rodriguez kind of tracking [the victim] as he runs from left to right. You also see, when you can get it up close, you see puffs of dirt come up from the pavement that indicates where the bullets are hitting.

The prosecutor argued that the evidence was highly probative because the State did not have other evidence to establish that the semiautomatic firearm allegedly used in the March 18 shooting was in the hands of either defendant on or about March 10. Co-counsel for Castañeda argued that the evidence had minimal relevance and was unfairly prejudicial but conceded that she was not aware of other evidence available to the State demonstrating that Castañeda possessed, used, and controlled the firearm on March 10 other than the surveillance camera footage.

### 2. Rulings on Admissibility

The court ruled, "[T]he March 10th shooting, based on what the State has said, provides an important evidentiary piece that the State has to prove here, and . . . under [ER] 404(b), I find that the shooting on March 10th is admissible in the trial of the March 18th shooting." Proceeding through the ER 404(b) analysis, the court ruled that there was "sufficient proffer by a preponderance of the evidence that the misconduct occurred" and the State offered the proposed footage in order "to tie . . . particularly, Mr. Casta[ñ]eda and the weapon to the later events" and to "the testimony anticipated and proffered from the firearms expert." The court then ruled on the proposed evidence and stated,

> That testimony is relevant for showing that Mr. Casta[ñ]eda aided, encouraged, assisted or in some other way acted that would be material to the State's claim of accomplice liability for the March

> 18th shooting. And in regard to the probative value, there is a prejudicial effect, no doubt, but reading ER 404(b) in conjunction with Rule 403, . . . the probative value, which is significant, is not substantially outweighed by the danger of unfair prejudice. So under [ER] 404(b), I am allowing that in.

The court later explained that "it's not the kind of video that we sometimes see that is particularly graphic or appeals to emotion in terms of some things that are sometimes more violent." And, as mentioned, the court granted a related defense motion to sever the March 10 UPF1 count against Castañeda from the trial on the March 18 charges.[11]

In response to the court's ruling, co-counsel for Castañeda requested that the court limit the risk of unfair prejudice from the video by omitting mention that a 15-year-old victim was injured during the shooting, and the prosecutor indicated that the State would be willing to omit mention of the March 10 victim's injury and would not plan to present evidence of "the actual injury to [the victim], how we connected him to the scene." The court granted Castañeda's motion.

### 3. Admission of March 10 Surveillance Camera Footage Was Proper

The trial court did not abuse its discretion in its rulings as to this evidence. The defendants do not dispute the court's determination that as the proponent of the evidence, the State had proved by a preponderance of the evidence that the March 10 shooting occurred or that the court issued a properly worded limiting instruction later on at trial. The court correctly determined that the State sought to offer the video recording of the March 10 shooting for an allowable purpose,

---

[11] Defense counsel later moved for reconsideration of this ruling and to restrict the evidence to still images from the footage, rather than video. The court denied the motions.

primarily for identifying not only Castañeda himself but also to establish his association with and control over the semiautomatic firearm on March 10. The court also reasonably determined that this purpose was relevant to and highly probative of establishing the State's theory of accomplice liability against Castañeda for the March 18 shooting: that Castañeda's possession, use, and control over that same firearm eight days earlier supported a reasonable inference that Castañeda aided Lopez in the commission of the March 18 shooting by supplying his gun to Lopez.

The court also properly determined that the potential for unfair prejudice associated with the video recording was not greater than its significant probative value. According to the court, the depiction in the footage of multiple muzzle flashes and Castañeda tracking the victim from left to right was neither graphic nor generated a strong emotional reaction and, relatedly, its video quality was such that defense counsel could reasonably argue to the jury that the footage was "too unclear" or "too distant" to support the State's allegations. Furthermore, the court also understood that it was reducing the potential for unfair prejudice of the March 10 footage through its ruling severing the March 10 UPF1 charge against Castañeda from the trial on the March 18 charges. Moreover, the footage was relatively short in length and the court granted Castañeda's motion to limit evidence of the victim's injuries arising from the March 10 shooting, which further reduced the risk of unfair prejudice. A reasonable person would take the view adopted by the trial court in making the foregoing evidentiary ruling.

Castañeda nevertheless presents several additional assertions challenging the court's ruling. These contentions do not establish an entitlement to relief. First, to the extent that appellate defense counsel challenges the propriety of the trial court's ruling based on the content of the video itself, they have not designated for our review the pretrial exhibit containing the video in question and have, therefore, not carried their burden to properly designate a record that enables our review of their challenge on appeal. *State v. Burkins*, 94 Wn. App. 677, 692, 973 P.2d 15, 24 (1999) ("The party seeking review has the burden of perfecting the record so that this court has before it all relevant evidence.").

Next, Castañeda asserts that the trial court erred because the footage had only minimal probative value. This is so, Castañeda contends, because he did not dispute his identity as one of the individuals involved in the March 18 shooting. Castañeda is mistaken. The State was required to carry the burden of proving his accomplice liability for the March 18 joint charges beyond a reasonable doubt and was not required to accept a stipulation short of the persuasive weight of its testimony and exhibits.[12] Moreover, proof of his identity did not equate to proof of the central components of the State's accomplice liability case against him for the March 18 shooting; namely, his use, possession, and control over the semiautomatic firearm before March 18 and his provision of that firearm to Lopez prior to that shooting.

Castañeda also contends that the trial court erred because, according to him, this evidence could prove his accomplice liability only by means of an

---

[12] *See State v. Taylor*, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019).

improper propensity inference. However, as explained in section I.B and section I.C.1, *supra*, the video recording was not offered to show that Castañeda had the *character or trait* of being an accomplice or of carrying a gun but, rather, to establish the fact of his possession, control, and use of the firearm in question on March 10 as part of an inference that he lent the firearm to Lopez for the shooting on March 18. Moreover, although not presented to the court until after it made its evidentiary ruling and after the parties agreed to present the jury with a stipulation regarding the March 10 shooting instead of the video recording, the court issued a limiting instruction regarding the footage in question. Neither of the appellants challenge the validity of the instruction or present evidence in support of a proposition that the jury failed to follow it.[13] Thus, the trial court did not abuse its discretion when it issued its ER 404(b) ruling regarding the March 10 surveillance footage.

D.     Lopez' Nickname

Appellants next assert that the trial court abused its discretion when it ruled pretrial that under ER 403, the State's proposed evidence regarding Lopez' nickname, "Evil," would be admissible at trial under certain limited circumstances. The trial court did not err in so ruling.

---

[13] Castañeda also contends that the trial court improperly admitted the footage as res gestae evidence. The State responds that "the trial court did not rely on res gestae as a basis for admission, nor is the State offering res gestae as an alternate theory on which to affirm." As follows from our analysis herein, the State's characterization is correct. Thus, Castañeda's contention does not establish an entitlement to relief on this alternate basis.

### 1. State's Proposed Evidence

Here, the trial court heard argument as to certain of the proposed evidence on which the State sought to rely and then, several days later, issued all of its rulings as to that evidence. As mentioned, the State argued that Mariscal Bernal had not met Lopez beforehand and was only introduced to him by the name "Evil." The State also indicated that Mariscal Bernal was expected to testify that she saw a weapon when she was in the car. Additionally, the following exchange occurred between the court and the prosecutor regarding her testimony:

> [PROSECUTOR]: . . . Mariscal []Bernal will testify that all three girls were in the back seat, and it was occupied by—the driver's seat was occupied by a male who fits the description of Mr. Casta[ñ]eda []Rodriguez, the front passenger.
> She was introduced to [Lopez] as "Evil" and she will give a physical description that is consistent with the appearance of Mr. Lopez Cruz. And then she will describe, consistent with what we know from video,[14] the car creeping around the neighborhood, going up and down alleys, spending an inordinate amount of time in a very small neighborhood, before ultimately describing the car pulling up [to the park,] turning around as Mr. Lopez Cruz gets out, hearing at least him fire the shots, and then getting back in the car and going to, ultimately, the [apartment] complex.
> THE COURT: What is your understanding—what is your understanding in regard to what the evidence will show as to when [she] first heard the name "Evil" used as a name in this context?
> [PROSECUTOR]: When she got in the car.

The prosecutor also indicated that Mariscal Bernal's May 2020 statement to the police included a description of the gun that "Evil" had in the front seat with him that was consistent with a semiautomatic firearm with an extended magazine. The prosecutor agreed with the court's characterization of the State's argument that her anticipated testimony using the name "Evil" to refer to Lopez was critical to its

---

[14] Law enforcement investigation uncovered recordings from video cameras in the surrounding neighborhood.

prosecution of Lopez because the nickname provided the link through which she identified Lopez with the firearm in the car on the night of the March 18 shooting.

With regard to the State's other proposed evidence in support of establishing the connection between Lopez and the nickname "Evil," the State filed a memorandum and entered into the record an electronic storage device with folder names matching the letters at the beginning of the headings in its memorandum that discussed each piece of evidence. The State's pretrial memorandum, in relevant part, described the evidence that it sought to introduce and its purpose as follows:

> A.      Snapchat videos provided to Kent PD by Auburn PD Det. Lindgren
>
> The State will call Auburn PD Det. Lindgren with the expectation that he will testify that he was following the Snapchat accounts of both defendants . . . and that he sent photos and videos of Snapchat posts he obtained during his open source monitoring of the defendants' respective Snapchat accounts to Kent PD. He will also testify that he provided the names of the defendants as the respective owners of the Snapchat accounts he was following in an undercover capacity. The photos and videos he provided show the following:
>> . . .
>> —Screen shot of a video posted by "Evil Loko 19 h ago" showing the front portion of a dark gray Audi with tinted windows and 5-point wheels with "Travis Word" superimposed across the bottom of the screen
>> —Screen shot (blurry) of a video posted by "Evil Loko 19 h ago" showing the rear portion of a dark gray Audi with tinted windows and 5-point wheels with "Travis Word" superimposed across the bottom of the screen
>> . . .
>> —Video posted by "Evil Loko 19h ago" with audio and the words "Travis Word" superimposed across the bottom of the screen; the video shows the gravesite of [an individual]

and then pans up to show the Audi. The stills described above were taken from this video.

. . . .

C.  Photos/Video of the "Travis Word" Snapchat post described above located in defendant Lopez []Cruz's phone and Snapchat account.

Various versions of the video and still photos were found pursuant to the search warrants served on defendant Lopez []Cruz's phone and Snapchat account by Kent PD. These photos and videos are necessary to corroborate the testimony of Det. Lindgren, to tie the images directly to defendant Lopez []Cruz, and as evidence of his street moniker, "Evil," by which he was commonly referred to.

. . . .

G.  Address book found during the search of defendant Lopez []Cruz's residence.

A search warrant was served on defendant Lopez []Cruz's residence during the course of the investigation. The only item of evidentiary value located was an address book purporting to belong to "Loksero Evil" with phone number [omitted]. This is the number detectives tied to defendant Lopez []Cruz and corroborates that Lopez []Cruz goes by the street moniker, "Evil." The address book also lists phone numbers for defendant Casta[ñ]eda []Rodriguez and his then girlfriend . . .

. . . .

J.  Reference to "Evil" in Facebook conversation between Lyndsel [sic] Osorio and defendant Casta[ñ]eda []Rodriguez shortly before the murder of Jos[é] DeSantiago []Perez, and identification of "Evil" by Sheccid Mariscal []Bernal.

Evidence will show that the afternoon of March 18 Lyndseyl Osorio was visiting Sheccid Mariscal []Bernal at the latter's then-residence, which was approximately one block east and north of the [park] where victim Desantiago []Perez was killed. According to Mariscal []Bernal, she and Lyndseyl, along with Lyndseyl's sister, Van[]essa, were making plans to go to someone else's residence to hang out. Evidence obtained from defendant Casta[ñ]eda []Rodriguez's phone, as well as the Facebook accounts belonging to him and Lynseyl, shows that the following conversation between the two occurred . . . :

. . .

- 19 -

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | You called Andy. |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Tell evil to message nessa on Snapchat |

| Author | Andy Castañeda . . . . . . |
| --- | --- |
| Body | Ayeb |

| Author | Andy Castañeda . . . . . . |
| --- | --- |
| Body | Tell vanessa we are here |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Okay |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Andy missed your call. |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Aye |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Get in the car |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | So my mom dont see yall |

| Author | Lyndseyl Osorio . . . . . . |
| --- | --- |
| Body | Oh nvm |

Location data obtained from a variety of sources for each defendant (call detail records, their respective cellular devices, Snapchat) shows the two traveling from the Osorio sisters' residence . . . , where they picked up Van[]essa, to Mariscal []Bernal's neighborhood (including the homicide location), where they picked up Mariscal []Bernal and Lyndseyl. All three girls were in the car

when defendant Lopez []Cruz got out at approximately 7:49 p.m. and shot at DeSantiago []Perez, Adalberto Valencia, and Peter Tenorio.

(Boldface omitted.)

The court inquired as to the relevance of the Facebook conversation, and the State argued as follows:

[Mariscal Bernal] doesn't know Mr. Casta[ñ]eda []Rodriguez's name. She only recalled Mr. Lopez Cruz's name by his street name which is how she was introduced to him; that name being "Evil." There is no way for her to be able to identify him. And this conversation which provides the context for proving how all of these five got together—the Osorio sisters, Sheccid Mariscal []Bernal, Mr. Casta[ñ]eda []Rodriguez, Mr. Lopez Cruz—is integral to the jury understanding how those pieces were put together, and how it is that we have the five of them in the car in the neighborhood [in question] prowling around until Mr. Lopez Cruz gets out and shoots Mr. DeSantiago [Perez] in the head. And there is no way to alter the Facebook record, which is what this conversation comes from in order to reflect that.
So I think that's the context in which the [c]ourt needs to consider, along with the other evidence the State is offering with respect to Mr. Lopez Cruz's street name of "Evil" in determining, ultimately, whether and to what extent evidence of that comes in.

Defense counsel argued that the State might not be able to lay a foundation to establish that Lopez' nickname was "Evil," the fact that Lopez' nickname was "Evil" was not essential to the State's case, the nickname could be "sanitized," and, regardless, its admission would result in a high risk of unfair prejudice to him because it would associate Lopez with an "evil" character trait, which would be emotional and inflammatory to the jury.[15]

The State emphasized that Mariscal Bernal knew Lopez only by the name "Evil," explaining, "There is no way to excise that from this trial in a manner that

---

[15] Defense counsel for Castañeda, for his part, conceded with regard to Lopez' nickname, "I guess the overall answer is maybe they do need that."

allows the State to prove his identity as one of the individuals involved, particularly in the shooting on March 18th that ended the life of Mr. DeSantiago Perez." The State further responded,

> I think the difficulty here is that Ms. Mariscal []Bernal is going to testify, and I can't put her in the position of taking the stand and raising her hand and swearing an oath to tell the truth, and then ask her to, in effect, lie about how she was introduced to the front-seat passenger and by what name he was referred to.
>
> I mean, it's unfortunate that Mr. Lopez Cruz took on the street name "Evil," but that should not shield him from the full evidence being presented of his involvement in the particular crime, and for better or worse, like it or not, his street moniker is part of the circumstantial evidence that ties him directly to the shooting of Jos[é] DeSantiago [Perez], and there's no way around that.

Relatedly, the prosecutor indicated that the State was not intending to undertake an in-court identification of Lopez because a significant amount of time had passed since the charged conduct occurred, there was no other identification procedure undertaken with Mariscal Bernal as part of the 2020 investigation, and "that night was the first and only time that she had ever seen either of these defendants." Defense counsel moved to exclude any in-court identification by Mariscal Bernal. The court conditionally granted the defense motion and ordered the State to not do so without first revisiting the issue in the absence of the jury, should her resulting testimony warrant such an identification.

### 2.  Rulings on Admissibility

The court first ruled that it was not outright prohibiting the State's use of the nickname "Evil" but clarified that it was prohibiting the nickname from being used as a replacement name for referring to Lopez, unless "there is someone such as Ms. Mariscal [Bernal] who only knew him as 'Evil,' then that will need to be clear

from the testimony." With regard to Mariscal Bernal's testimony, the court specified that she would be permitted to refer to him as "Evil," so long as the content and order of her testimony established the requisite evidentiary chain.

The court then issued its rulings as to other evidence regarding Lopez' nickname and considered each piece of evidence by reference to the folder name as presented in the State's digital exhibit:

> Let me talk about Folder A in Pretrial Exhibit 1. . . . [T]he items in Folder A are admissible, or I will admit them for the following—with a couple of exceptions and for the following reasons:
> . . . .
> There is a video in that folder. I find, indirectly, that only the portion of the video showing the Audi is relevant and admissible. That portion of the video begins after the video showing the grave and the bandanna, so it's only—the only part that I'm finding relevant and admissible is the part that begins after the gravesite and the bandanna and shows the Audi. . . .
>
> . . . .
> This folder also has a couple of screen names with the word "Evil" in it.[16] Again, I do not find that any prejudice from that substantially outweighs the probative value of identifying the defendants and connecting Mr. Lopez to the events here.
> There was also argument about the words "Travis Word" over one of the images. I don't find that there's any—I find that there's not any prejudice from those words here, particularly since I'm—the gravesite is not coming in. I don't—this is how the images were found, and I don't find that there was any prejudice or any substantial danger of the jury speculating in that regard.
> . . .
> Folder C contains a couple of sub-folders. It contains still shots of a bandanna and a grave. These are, I think, similar still shots to the video under Folder A. These still shots, in my view, have minimal probative value and are substantially outweighed by the danger of unfair prejudice or confusion of issues, and so the images in subfolder—the phone subfolder in Folder C will be excluded.
> The Snapchat subfolder under Folder C shows a video at the gravesite. It's the same or very similar video to the video in Folder A, and my ruling is the same as regards the video in Folder A.
> . . . .

---

[16] In the top left corner of the photographs, where the Snapchat user's username is superimposed, there is text that reads, "Evil_Loko."

Folder G contains an address book apparently recovered from Mr. Lopez's home. . . .

. . . .

The first image [from the address book] will be excluded. This is the cover page that refers to prison. That does not have, I find, probative value, and it would be substantially outweighed by the danger of unfair prejudice.

The second image is admissible. It has significant probative value in regard to a notebook found in Mr. Lopez's home using the name "Evil," which connects to, for example, images found in, I believe, it's Folder A that used the same nickname with images loaded of the Audi or the Audi symbol. Again, any prejudice from that nickname does not substantially outweigh the probative value.

And the third image will be allowed. I do find it's admissible for purposes of identification and the phone numbers—and I am going to require the name "Trigger," which is listed there, to be redacted.

. . . .

Folder J doesn't actually appear on Pretrial Exhibit 1. [The prosecutor], instead, provided the text of the exchange in his memorandum.

I find this to be admissible. It is probative circumstantial evidence of Mr. Lopez being at the material time and location, and any prejudice from it is not—does not substantially outweigh the probative value.

Thereafter, counsel for Lopez requested that the court either compel the State to accept a stipulation or to redact the evidence with the moniker "Evil." The court indicated that "there is not a stipulation to date" and it was "reluctant to take a piece of evidence that appears in several places and tie the State's hands in that regard."

The State, in turn, responded that it could not accept such a stipulation for several reasons: Mariscal Bernal's credibility was likely going to be attacked by the defense attorneys during trial and the evidence referencing Lopez' "Evil" moniker would bolster her testimony about the March 18 shooting, removing reference to that nickname could inadvertently credit one of the defendants' proposed expert

witnesses who was anticipated to testify about issues with social influence and memory. The prosecutor added,

> I need to be able to establish that "Evil" is a nickname tied to Mr. Lopez Cruz. I'm not going to be arguing it in any way, shape, or form as it being reflective of his character. It's an identifier, and it's the identifier by which Ms. Mariscal []Bernal knew him, and I can't change that. I also can't change the—the Facebook Messenger conversation between Mr. Casta[ñ]eda []Rodriguez and Linsel [sic] Osorio in which she instructs Mr. Casta[ñ]eda []Rodriguez: Tell "Evil" to message Nessa on Snapchat. I mean, I can't—I can't change those records in order to reflect that "Evil" is actually referring to Mr. Lopez Cruz. I have to establish that that is his nickname through the variety of ways that I have indicated to the [c]ourt I'm going to be doing that. And Ms. Mariscal []Bernal has to be able to get on the stand and testify honestly about how she knew the front-seat passenger who she was just introduced to on March 18th, 2020, shortly before the murder.

The court also asked counsel for Lopez how he would either redact the image of the notebook or the Snapchat image with the "Evil" moniker or otherwise stipulate. He responded,

> In essence, redact and simply tell the jury that it was determined that it was Mr. Lopez Cruz's account, and we'll stipulate to that.
> As for the address book, it was found in Mr. Lopez Cruz's home. We had not planned on providing any evidence that it was not his. If necessary, we could stipulate that it is. The point is, we would not have the word "Evil" associated with my client.

The court denied the request, ruling, "[T]o the extent that there's prejudice, I don't believe it substantially outweighs the probative value of the connections of identifying and connecting Mr. Lopez to the events in the case."

Additionally, defense counsel requested that the parties use the word "nickname" rather than "street name" to refer to any alternative name used by Castañeda or Lopez. The court granted their request on that matter.

### 3.     Admission of Lopez' Nickname Was Proper

The trial court did not abuse its discretion in its evidentiary rulings regarding Lopez' nickname.  First, the court did not err when it ruled that the evidence was not only relevant but also highly probative.  As explained in section I.B, *supra*, the fact that Lopez went by the name "Evil" was a critical link connecting the State's central and only eyewitness to the events, participants, and semiautomatic firearm associated with the March 18 shooting and the circumstances were such that she could not identify Lopez by another name.[17]  It was therefore highly probative to the State's case-in-chief, and the court did not err when it so determined.  *See State v. Rodriguez*, 163 Wn. App. 215, 229-30, 259 P.3d 1145 (2011) (holding trial court did not err when it allowed witnesses to refer to defendant by "Little Evil" nickname because it was name by which they knew him).[18]  Additional evidence from disparate sources that referenced this nickname, such as  Snapchat, Facebook, the appellants' cell phones, and Lopez' address book, all served to corroborate that eyewitness' testimony as to that critical evidentiary link.  Furthermore, such evidence would be relevant to rebut the anticipated testimony of the proposed defense expert witness on memory and social influence.

The trial court also did not err when it determined that the evidence's probative value was not substantially outweighed by its potential for unfair prejudice.  As the State argued to the trial court, the fact that the nickname is "unfortunate," and is in that sense prejudicial, does not mean that the prejudice is

---

[17] According to the State, after the Osorio sisters provided initial statements to law enforcement in 2020, neither was available for pretrial interviews or trial testimony.

[18] Lopez' appellate briefing argues that this court's decision in *Rodriguez* "is poorly reasoned and should not be followed."  We disagree and follow this court's decision therein.

unfair, particularly given that it is a name Lopez has chosen to use. Additionally, to the extent that there was potential for *unfair* prejudice, the court took numerous steps to reduce that risk, including ordering the redaction of certain unrelated and irrelevant text, requiring the State to establish through Mariscal Bernal's testimony that she knew him only by that nickname before she could identify him as such before the jury, restricting the State's ability to use the nickname as a substitute for Lopez' government name with regard to its witnesses, and granting defense counsel's motion to exclude the use of the term "street name" from the trial. Given all of this, the court plainly exercised its discretion in a reasonable manner in light of the probative value and potential for prejudice associated with Lopez' nickname. Accordingly, the trial court did not err in its rulings regarding the admissibility of the evidence referencing Lopez' nickname.

### E.     Castañeda's Social Media Account and Related Images

Castañeda next asserts that the trial court abused its discretion when it ruled pretrial that images from his social media account and other related images were admissible at trial to show his identity and connection with the semiautomatic firearm used in the March 18 incident. The trial court did not err.

#### 1.     State's Proposed Evidence

As explained in section I.B, *supra*, the State sought a pretrial ruling on the admissibility of certain electronic pretrial exhibits containing screenshots and videos associated with Castañeda's Snapchat account and his cell phone, as well as photographs from his arrest. In the pretrial memorandum described in section

I.D.1, *supra*, the State described the evidence provided by Lindgren relating to Castañeda in folder A as including the following:

> —Screen shot of a video posted by "Andy 3m ago" showing defendant Casta[ñ]eda []Rodriguez's left hand resting atop a semi-automatic firearm with an extended magazine; the photo shows the defendant's tattoo, "UL Santos"; "A Day in the Life of Andy" is superimposed across the bottom of the screen.

The pretrial memorandum continued as follows:

> B.   Photos/Video of the "Day in the Life of Andy" Snapchat post described above located in defendant Castañeda []Rodriguez's phone and Snapchat account.
>
> Various versions of the video and still photos were found pursuant to the search warrants served on defendant Casta[ñ]eda []Rodriguez's phone and Snapchat account by Kent PD.  These photos and videos are necessary to corroborate the testimony of Det. Lindgren and tie the images directly to defendant Casta[ñ]eda []Rodriguez.
> . . . .
>
> D.   Photos of Defendant Casta[ñ]eda []Rodriguez following his arrest showing his "UL Santos" tattoo.
>
> Admission of at least one photograph taken of the defendant post-arrest that shows the prominent "UL Santos" tattoo on his left hand is necessary to tie him to the images in the stills and videos, which in turn connect him to the Audi and a firearm consistent with the type having been used in the non-fatal shooting of [the victim] on March 10 and the murder of Jos[é] DeSantiago []Perez (and accompanying assaults on [the other victims]) on March 18.
> . . . .
>
> F.   Photos of semi-automatic firearm on a person's lap with "Cash or trays Rn" found on both defendants' phones.
>
> During the search of the phones belonging to each defendant pursuant to the respective search warrants, images of what appears to be the same firearm with extended magazine depicted in the "Day in the Life of Andy" videos/photos appear.  The photos show the gun on a

> person's lap with the words "Cash or trays Rn" super-imposed across the image.

(Boldface omitted.)  The metadata from the photographs from Castañeda's cell phone were time stamped as having been created on either March 21 or March 22, several days *after* the March 18 shooting.

        2.      Rulings on Admissibility

The court structured its rulings by reference to the letter name of the folder of the electronic storage drive in which the State's proposed evidence was located. In ruling on the admissibility of the pretrial exhibits of the images and video in folder A, the court stated as follows:

> There's a photo with a tattoo and a firearm.  This is marked img_6873.  I understand that to mean Image 6873.  I find that this is admissible, and I'm going to explain my ruling under [ER] 404(b).
>     The—I received a preponderance of the evidence to show that this was—that there is such an image, and that it can arguably be tied to Mr. Casta[ñ]eda through the reasons that we've received into evidence and discussed in court.  The purpose offered is to connect—the connection of Mr. Casta[ñ]eda to the firearm and to the Audi, which was said to be at the scene of the homicide.
>     The identification is highly probative of the State proving who committed the alleged homicide, and connecting that through a series of photos, including the photos of the hand, tattoo, firearm and later photos of when Mr. Casta[ñ]eda was arrested, have significant probative value, and although there is some prejudice, the prejudice is . . . outweigh[ed by] the probative value.

Then, in discussing folder B, the court ruled as follows:

> The images in Folder B are admissible for the same—these are largely [the] same or similar images to img6873, although there is a video as well.  There's also some metadata here that is not provided in Folder A.  For the reasons that I've articulated that Image 6873 is admissible, these images are also admissible.
>     I am not excluding the video of the portion regarding cash for two reasons, related reasons.  Those portions of the video also show the extended magazine, which is relevant to the identity of the

firearm. I believe there will be testimony both from the firearms expert and from Ms. Mariscal [Bernal] in that regard and so the portion of the image that shows the extended magazine also shows the cash. I do not find any prejudice, certainly not any prejudice that outweighs the probative value of the cash. Let me—that wasn't clear. The probative value is not the cash. The probative value is the magazine and the firearm. I don't find that the cash is prejudicial, and it certainly didn't substantially outweigh the firearm portion of the video.

In ruling on the contents of folder D, the court indicated that the pretrial exhibit contained a series of photographs taken "apparently at the arrest of Mr. Casta[ñ]eda." It explained,

There's significant probative value in regard to identifying Mr. Casta[ñ]eda and the events of March 18th. In regard to the tattoo, there is arguably some danger of prejudice, but the danger of prejudice does not substantially outweigh the significant probative value of the images. The images in Folder D will be admissible.

Then, as to the admissibility of the photograph in folder F, the court stated,

I don't know that a [ER] 404(b) analysis is needed here, but I will just say, again, there's been a preponderance of the evidence that shows that this image exists, that it came from Mr. Casta[ñ]eda's—or it was found on Mr. Casta[ñ]eda's phone. There's been proffered evidence that the firearms expert will testify that this is consistent with the firearm that was used in the shooting; that the purpose again is to identify the firearm and through a series of connections connecting it to the defendants in this case including, without limitation, Mr. Casta[ñ]eda's accomplice liability. The prejudicial effect does not substantially outweigh the probative value in regard to the images in Exhibit F.

There is an overlay on, I think, both images. It states "cash or trays are in." That must be redacted. I find that that does not have probative value and—it didn't have probative value, and it's also prejudicial to a substantial extent.

The following day, counsel for Castañeda requested that the court redact the language "Day in the Life of Andy" that Castañeda had superimposed on the photographs of him with the gun and the tattoo, arguing that it was unfairly

prejudicial and specifically stating, "It implies the gun . . . that it's a regular thing, and that he's actively out there with guns." The court denied the motion.

### 3. Admission of Social Media Content and Images Was Proper

The trial court did not abuse its discretion when it admitted the foregoing evidence. The court found that the images and video had significant probative value in that they identified Castañeda by his "UL Santos" tattoo, which appeared in other images as well as a postarrest photograph, and identified his association with the semiautomatic firearm with an extended magazine that Lopez used during the March 18 shooting. On consideration of the other aspects of the images and the video, the court found that the two folded bundles of cash were neither probative nor prejudicial but the frame of the video depicting the cash also depicted the extended magazine protruding from the handle of the handgun, which the court found highly probative of the State's theory regarding Castañeda's accomplice liability in which the State sought to prove that the firearm depicted therein was the same as the one used in the March 10 and March 18 shooting.

Furthermore, with regard to the superimposed language "Day in the Life of Andy," it is apparent that the court determined that when considered alongside its potential to identify Castañeda by his first name along with the other probative aspects of the images and video, such superimposed text was not unfairly prejudicial. In light of the trial court's analysis, a reasonable person could take the view adopted by the court as to the admissibility of the evidence in question. Thus, the trial court did not abuse its discretion in so ruling.

Nevertheless, the appellants argued before the trial court and again assert on appeal that the evidence in question had minimal probative value because they conceded that Castañeda was involved in the March 18 shooting. However, not only was Castañeda's accomplice liability still in dispute, but his association with the firearm used by Lopez for the March 18 shooting was as well. The record does not reflect that prior to trial (or at trial), the defendants sought to offer, or offered, a stipulation equal to the persuasive weight of the State's evidence. Accordingly, the appellants do not establish an entitlement to appellate relief on this issue.

F.      Claimed Inference of Gang Affiliation

The appellants also argued at trial and assert on appeal that the trial court erred in its evidentiary rulings because the foregoing evidence, when considered in its totality, carried the risk of a reasonable implication to the jury that the defendants were affiliated with a gang. The appellants' assertions fail.

First, during the pretrial proceedings, the State ultimately did not offer the evidence in question for the purpose of establishing that the charged crimes were motivated by the defendants' purported gang affiliation, nor did the trial court admit any of the offered evidence for such a purpose. Furthermore, as conceded in Lopez' appellate briefing and uncontested by Castañeda, in the resulting trial, "no witness told jurors . . . that the co-defendants were in a gang." Nor, for that matter, do they assert that the prosecutor indicated as much during opening statements or closing argument or offered evidence during the State's case-in-chief for the purpose of establishing that the charged crimes were motivated by gang affiliation. Indeed, the prosecutor's opening statement emphasized that its evidence in the

case "won't tell you the why" underlying Lopez' and Castañeda's alleged conduct toward the victims in the case. In addition, the trial court expressly instructed the jury to only make reasonable inferences from the record[19] and further instructed them as follows:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of videos and photographs of a firearm from the defendant's phones and social media and may be considered by you only for the purpose of identification of the defendants and their association with the firearm. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Therefore, because gang affiliation was plainly not at issue in this case, any inference that the jury drew regarding gang affiliation would not be a reasonable one. However, rather than present any evidence or citation to the record that a juror considered such a possibility or drew such an unreasonable inference on a matter not at issue at trial, the appellants present only broad and, frankly, racialized speculation in support of this contention on appeal. When asked at oral argument before this court whether it would be proper to lean into racist tropes in order to protect accused persons from other impacts of racism in the criminal legal system, defense counsel for Castañeda deferred to Lopez' appellate counsel, who ultimately responded that "the danger of the jury drawing the improper inference

---

[19] For instance, jury instruction 4 provided, in pertinent part,
> The evidence that has been presented to you may be either direct or circumstantial. The term "direct evidence" refers to evidence that is given by a witness who has directly perceived something at issue in this case. The term "circumstantial evidence" refers to *evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case.*

(Emphasis added.)

from that evidence is too big."[20]  We decline the appellants' invitation to speculate in this regard and, thus, the challenge fails.[21]

G.    March 18 Bodycam Footage

The appellants next assert that the trial court abused its discretion when it ruled prior to trial, pursuant to ER 403, that two separate excerpts taken from two officers' bodycam recordings were admissible at trial.  The appellants again fail to establish an abuse of discretion by the trial court.

---

[20] Wash. Ct. of Appeals oral arg., *State v. Lopez Cruz,* No. 86212-0-I, at 10 min., 55 sec. to 11 min., 59 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025091045/.

Prior to this exchange, counsel for Castañeda presented the issue by stating, "The argument is, and I think it is correct, that the 'Evil' moniker and the UL tattoo on my client's hand necessarily implied to any reasonably intelligent juror that this was a gang-related crime." *Id.* at 8 min., 16 sec.  The court then inquired,

> [M]y question is, doesn't that spin us out into a doom loop, right?  The issue here is a street name and hand tattoos, associated with guns and cash, and the defense position seems to be that these are indicative of gang affiliation; a position that is arguably rooted in racist tropes about Latino males in particular.  But we also know that juries are susceptible to rac[ial] and implicit bias the same as everybody else and, so, do we protect accused peoples from racist tropes by leaning into racist tropes in the exclusion of evidence?

*Id.* at 8 min., 33 sec.  Counsel for Lopez responded, in relevant part, "As the trier of fact, looking at the evidence in front of them, all of the evidence in front of them, *that evidence paints a picture that they're gangbangers*.  The street name of my client, 'Evil,' there's not much—there's no nuance there." *Id.* at 10 min., 34 sec. (emphasis added).

The court noted that there are "lots of street names that are unflattering or even intimidating that are intended to be that way, but might not originate within a gang context" and then repeated its original inquiry: "Do we lean into racism to protect accused persons from racism in the context of the criminal legal system?" *Id.* at 10 min., 55 sec.  Lopez' attorney answered that in the abstract, such a name does not "lead to an inference of gang affiliation" but urged that the risk of an improper inference increased when the nickname was considered together with the other evidence admitted at trial, along with "what we're talking about as the racist trope; young Hispanic men committing crimes in the community." *Id.* at 11 min., 23 sec.

[21] To the extent that the appellants assert, with regard to gang affiliation, that the trial court erred in its consideration of the potential for prejudice, its denial of their request for redaction, or denial of their request to compel the State to accept a stipulation, these assertions fail as well.

As analyzed at length *supra*, the trial court heard and considered the parties' arguments on this matter, and the court did not err in balancing the probative value of the challenged evidence against its potential for unfair prejudice to them.  As to the stipulation, as a general matter and as correctly identified in Lopez' appellate briefing, the State is generally not required to accept a defendant's stipulation to an element of a charged crime nor is it precluded from offering evidence on the issue merely because a defendant offers to stipulate. *See Taylor*, 193 Wn.2d at 697.  Thus, the appellants' challenges fail.

1.      Legal Standard

We have stated that

"[a]ccurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect." *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). The test is identical for videotapes. *State v. Stockmyer*, 83 Wn. App. 77, 84, 920 P.2d 1201 (1996) (citing *State v. Brooks*, 30 Wn. App. 280, 286, 633 P.2d 1345 (1981)). The decision whether to admit or exclude evidence lies within the sound discretion of the trial court. *State v. Russell*, 125 Wn.2d 24, 75-77, 882 P.2d 747 (1994).

*State v. Burkins*, 94 Wn. App. 677, 691, 973 P.2d 15 (1999) (alteration in original).

Furthermore, in a later decision that considered graphic autopsy photographs, we

stated as follows:

A bloody, brutal crime cannot be explained to a jury in a lily-white manner. *State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947, 91 S. Ct. 2273, 29 L. Ed. 2d 855 (1971). The State may present "ample evidence" to prove every element of the crime. Even so, prosecutors do not have "carte blanche to introduce every piece of admissible evidence" when the cumulative effect of that evidence is inflammatory and unnecessary. *Crenshaw*, 98 Wn.2d at 807; *see State v. Sargent*, 40 Wn. App. 340, 698 P.2d 598 (1985) (abuse of discretion to admit four autopsy photographs when only one helped to show premeditation, and testimonial evidence and diagrams could have revealed the same information in a nonprejudicial manner).
. . . . Unless it is clear from the record that the primary reason to admit gruesome photographs is to inflame the jury's passion, appellate courts will uphold the decision of the trial court. The law requires an exercise of restraint, not a preclusion simply because other less inflammatory testimonial evidence is available. *State v. Stackhouse*, 90 Wn. App. 344, 357, 957 P.2d 218 (1998).

*State v. Whitaker*, 133 Wn. App. 199, 227, 135 P.3d 923 (2006).

2.      Defense Motion to Exclude

Prior to trial, defense counsel moved in limine to exclude any visually graphic evidence that was unfairly prejudicial.  The State indicated that it planned to rely on excerpts from the video recordings taken from the bodycams worn by KPD Sergeant Michael Eaton, KPD Officer Eli Morris, and KPD Officer Lovai Hong, who all responded to the dispatch following the March 18 shooting.[22]

Defense counsel sought to exclude the majority of the bodycam footage from trial.  They did not object to a portion of the recordings depicting the officers arriving at the scene and talking to a witness.  However, they objected to "extensive video of the officers turning over Mr. DeSantiago [Perez], closeups of his injuries including audible noises," stating, "[H]e doesn't die until the next day—and we do think that's unfairly prejudicial and appeals to the emotions of the jury and doesn't have any probative value."

The prosecutor responded as follows:

The two body-worn—and these are just the body-worn footage from the officers that shows Mr. DeSantiago [Perez].  They both—so Mr. DeSantiago [Perez] had a gun in his waistband when he was found by officers.  Officer Morris is the one who found the gun in his waistband.  The video shows him retrieving that when Mr. DeSantiago [Perez] is turned over because he falls face down.  When officers arrive, they turn him over.  As they are checking him for other injuries, they find a .45 semiautomatic in a holster on the right side of his waistband.  Officer Morris removes that, hands it to the other officer, Officer Hong, who is the one who secures it.
    Defense has indicated a possible self-defense claim based on the fact that Mr. DeSantiago [Perez] was armed at the time he was shot.  I think the combination of that body-worn video along with Dr. Harruff's testimony is going to establish that there is no way he had that gun out or was brandishing it or anything of the sort when he

---

[22] The appellants do not contest the court's ruling as to the excerpt from Eaton's bodycam footage.

was shot in the—behind the left ear. So I think it's entirely relevant for that.

I think it is also relevant to show the efforts that officers were making in their description of his condition to aid that showed up. And, as [co-counsel for Castañeda] correctly notes, Mr. DeSantiago [Perez] didn't die right away. He died in the hospital the next morning. So connecting the autopsy images to the images of Mr. DeSantiago [Perez] at the scene as he is being treated initially when officers arrive, I think, is all relevant to establishing the identity of Mr. DeSantiago Perez.

It is highly probative evidence of that, and the State is not interested in stipulating with the defense—entering into a stipulation about the identity of Mr. DeSantiago Perez. I'm perfectly happy to prove that up. And, in fact, it's my intention to prove that up through testimony and exhibits at trial. I'm not required to accept their stipulation nor am I required to accept their assurance that, Well, we're not contesting his identity.

Co-counsel for Castañeda indicated that the defendants had either previously withdrawn or could withdraw their claim of self-defense regarding the March 18 charges and encouraged the court to watch the videos stating, "They are pretty disturbing, I think, for jurors, and I think they would appeal to the emotions of the jurors. I think what limited probative value [the prosecutor] is articulating can be accomplished without showing these videos." Defense counsel for Lopez argued that his issue was with the excerpt of Morris' bodycam footage and specifically stated,

The sounds, and this is obviously—you can see the traumatic head wound upfront, and you can hear these horrible sounds coming from his body as he's breathing and making this loud kind of grotesque snoring sound, and there's some moaning too. The moaning is kind of where the camera is off of him, but you can still hear it.

It just doesn't seem to be necessary for what [the prosecutor] is trying to present. I'll leave it for the [c]ourt to see that, but if any of that is to be presented, it seems to show what Officer Hong's doesn't show, which is the hole in the body, which I don't see why it's necessary, and I would suggest it be—my position is it should be shown in still photos.

The court inquired as to the length of the excerpts in question and the State indicated that Hong's and Morris' videos were, together, about ten minutes in duration.

Before the parties and the court watched the video excerpts together, the State expanded on why those portions of the footage were relevant and, with regard to showing that DeSantiago Perez had a gun in his waistband, the prosecutor stated,

> [I]t's my understanding from [d]efense that that is not something they're willing to just ignore, and if they're not willing to ignore it, then the best evidence of how it was discovered and the condition of it is actually the video. And so Officer Morris is the one who found the gun, removed it, handed it to Officer Hong. Officer Hong ultimately secures it in the back of his patrol car. That is all in the context of the initial efforts to render aid to Mr. DeSantiago Perez.
>     Secondly, when they roll him over, [defense counsel] is correct: You can see that he's been injured. There is—there is injury to both eyes. In other words, there is swelling to one, and the bullet came out of the right eye. That ties into one of the autopsy photos that Dr. Harruff will use in order to explain the nature of the injuries when he talks about having conducted the autopsy.

Counsel for both defendants, the deputy prosecutor, and the trial court then watched the two clips proposed by the State, as well as a segment of the third video from which the State sought to offer an excerpt.

Defense counsel thereafter indicated that they were no longer intending to argue a theory of self-defense for the March 18 joint charges. They argued that the fact that DeSantiago Perez "had a gun may be marginally relevant" but also stated, "[W]e're not anticipating making—we're not suggesting that he was brandishing it, or that this was self-defense or anything of that nature."

The prosecutor further argued that the excerpts from Morris' and Hong's bodycams were relevant because defense counsel might nonetheless elicit testimony regarding DeSantiago Perez having a gun and, based on the juror skepticism regarding the veracity of police testimony during voir dire, admitting the video excerpts would rebut a potential negative juror inference against the State's case. The prosecutor next argued,

> I think there are other purposes that support admissibility as well, *including identification of the victim to the extent that it goes to that* and *showing the nature of his injuries* and also *giving the jury a flavor* that you can't simply articulate via words *for how confused the initial response to a scene like this really is* and how much is going on and *why one officer who is taking care of the victim might not hear something being said by another witness or another officer who is standing four feet away from him or may not register on that*.

(Emphasis added.)

The prosecutor also argued that the clips were brief and the State bears the burden of proof beyond a reasonable doubt to prove the charged crimes. He further asserted, "[T]o the extent that there's been an argument made that it's prejudicial because it shows blood, because you hear the sounds of the agonal breathing, again, I think it goes without saying: We are here on a murder case, and there is a limit to the extent that you can sanitize that." Defense counsel for both defendants responded that the "disturbing," "troubling and emotionally evocative" content of the video clips along with the audio of the victim's breathing sounds would unfairly prejudice the jurors against their clients, and they requested that the video clips either be presented without sound or as still images. The court denied the motion to exclude and expressly held, "The videos are disturbing because of the injury, the somber subject matter, and ultimately what we know to be the loss

- 39 -

of life; however, I do not find that the danger of unfair prejudice substantially outweighs the probative value of the videos."

### 3.     Admission of March 18 Bodycam Excerpts Was Proper

The trial court did not abuse its discretion in so ruling.  As set forth *supra*, the State argued several persuasive bases as to why the bodycam excerpts had probative value, including that such evidence would corroborate autopsy photos and the nature of DeSantiago Perez' wounds, rebut a defense argument regarding DeSantiago Perez' possession of a gun, rebut a negative inference from the jury, and otherwise support the State's witnesses' testimony.  The State agreed that there was prejudice from the video because it showed the victim's blood, graphic gunshot wounds, and what the prosecutor described as "agonal breathing,"[23] but, it argued this was "a murder case, and there [wa]s a limit to the extent that you can sanitize that."  It also reiterated that the video evidence was of a limited duration. Based on the court's ruling, the trial court agreed with the State's arguments, and a reasonable person could take the view adopted by the trial court in that regard.

Furthermore, the appellants do not contend that the trial court misunderstood the graphic nature of the video excerpts.  They do not assert, and the record does not reflect, that trial defense counsel and the prosecutor misrepresented the content of the video excerpts to the court either before or after viewing them or that the court misunderstood that which it was shown.  Given all

---

[23] "Agonal breathing" is defined as including "gasping, barely or occasional breathing, moaning, sighing, gurgling, noisy, groaning, snorting, heavy or labored breathing" and is generally associated with the end of life.  Theresa M. Olasveengen, et al., *European Resuscitation Council Guidelines 2021: Basic Life Support*, 161 RESUSCITATION 98, 103 (2002).

of this, it is clear from the record that the State's "primary reason to admit gruesome" videos was not "to inflame the jury's passion," *see Whitaker*, 133 Wn. App. at 227, but, rather, to offer selected excerpts for several reasonable purposes.

Therefore, the trial court did not abuse its discretion when it ruled pretrial that the excerpts from the bodycam footage were admissible.[24]

II.     Prosecutorial Misconduct in Closing Argument

Lopez next asserts that the prosecutor committed misconduct during closing argument when the prosecutor mentioned, on one occasion while discussing the law in general, that the law is supposed "to make good moral sense." Counsel for Castañeda objected, but the court overruled the objection. However, the parties revisited the issue outside the presence of the jury, and the judge later reviewed the audio recording of the State's initial closing argument.

With regard to claims of prosecutorial misconduct, our Supreme Court instructs us that

> [o]nce a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced under one of two standards of review. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.

---

[24] With regard to defense counsel's request to omit the audio, the trial court did not err when it rejected this proposed modification. A reasonable person could conclude, given the concerns raised by the State about mistrust of police officers, that it would be unfair to the State to present the bodycam video clips without the accompanying audio (or an accompanying stipulation) because of the possibility that the jurors could draw a negative inference regarding the police officers or against the State from the lack of sound. Furthermore, such an omission would remove the officers' descriptions of DeSantiago Perez' wounds as they were rendering first aid, which were probative by means of corroborating other evidence regarding the nature of those wounds.

*State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). As to the propriety of the State's comment, we recently set forth the applicable legal standard and standard of review:

> "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." [RPC 3.8 cmt. 1.] Prosecutors represent the public, including defendants, and have a duty to see that fair trial rights are not violated. [*State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).] Prosecutors must "'seek convictions based only on probative evidence and sound reason.'" [*In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)).]
> A prosecutor acts improperly by seeking a conviction based on emotion rather than reason. [*State v. Echevarria*, 71 Wn. App. 595, 598, 860 P.2d 420 (1993) (quoting *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968)).] Reversal is required if the improper conduct prejudiced the defendant. [*State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008).]
> . . . We review allegations of prosecutorial misconduct for an abuse of discretion. [*State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)).] We review the argument within the context of the trial as a whole. [*In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 631, 316 P.3d 1020 (2014).] [The appellant] bears the burden of proving the prosecutor's argument was both improper and prejudicial. [*Lindsay*, 180 Wn.2d at 430.]

*State v. Craven*, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020) (footnotes omitted).

Our analysis in *Craven* is instructive. There, we held that the prosecutor committed misconduct when the core theme of the prosecutor's closing argument was that "each juror should feel right intellectually, emotionally, and instinctually when applying the law to the facts." *Id.* at 388-89. We stated that when the prosecutor's argument was considered as a whole,

> the prosecutor told the jurors they would know Craven's guilt beyond a reasonable doubt by, in equal measure, recognizing it

- 42 -

intellectually and feeling it emotionally in their hearts and viscerally in their guts. Equating "common intellectual sense" with "common moral sense," invited jurors to give the same weight to their rationality as to their emotions and instincts. By arguing "only [guilty] verdicts make sense" when also arguing the law must "make sense" in the head, heart, and gut, the prosecutor told jurors that arriving at a guilty verdict was as much emotional as intellectual. This can be understood only as an appeal to considerations other than the reasoned, intellectual application of law to facts. It risked a conviction based on reasons other than the evidence.

*Id.* at 387-88 (footnotes omitted). Such prosecutorial argument had the improper effect of both urging "the jury to rely on their emotions and instincts when weighing the facts alleged" and insisting that "a juror should 'feel right' and have a decision 'make sense' in the heart and in the gut when reaching a verdict." *Id.* at 388-89. We noted that such an argument runs contrary to the notion that jurors must "set aside their biases and intellectually apply the law to the facts, even if that result is distasteful or disappointing." *Id.* at 389.

We nevertheless determined that the appellant therein had not established that the misconduct was prejudicial. *Id.* at 390. We recognized that the trial court provided the well-established pattern jury instruction prior to closing argument that directed each juror to "reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference."[25] It also issued the following instruction immediately after the misconduct:

[The] jury will apply the law to the facts. The law is what is contained in my instructions. The facts are the evidence, which the jury finds to have been proven and established. It is an intellectual, not an emotional, decision.

---

[25] See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01, at 18 (5th ed. 2021).

*Id.* at 390-91 (alteration in original). We further acknowledged that the curative instruction significantly limited the potential for prejudice to the appellant therein not only because it "reminded the jury of its duties" but also because it was given "timely, shap[ing] the jury's understanding of the rest of the prosecutor's closing argument." *Id.* at 391. Therefore, we held that the appellant failed to show prejudice arising from the misconduct "[b]ecause the court here correctly stated the law when providing a curative instruction, we presume the jury followed the court's instructions, and nothing suggests the jury was misled." *Id.* at 391-92. (footnote omitted).

Here, in closing argument, the prosecutor began as follows:

Now, it may be somewhat overwhelming to you to get a packet with 41 instructions that took Judge Allred approximately 40 to 45 minutes to read aloud to you and to think to yourselves, "Oh, my. We have to go through all of that. We have to sort that out."

It's entirely normal and natural for you to feel that way, if, in fact, you do. If those thoughts are running through your head, let me try to set your mind at ease at least a little by reminding you that fundamentally, at the end of the day, the law is supposed to make sense. *It's supposed to make good common sense, and it's supposed to make good moral sense.*

[CO-COUNSEL FOR CASTAÑEDA]: Objection, Your Honor, to improper argument.

THE COURT: Overruled.

[CO-COUNSEL FOR CASTAÑEDA]: To the reference to moral—morality. It's a separate question.

THE COURT: Overruled.

[PROSECUTOR]: If you approach the instructions from that point of view with an eye towards the idea that it's supposed to make sense, you'll find that that packet of instructions is not quite so intimidating as it may have seemed at first blush.

And you'll also find that, if you have questions about what a particular instruction means, talking to your fellow jurors about it, remembering that it's supposed to make sense, will help you sort out whatever questions you may have.

(Emphasis added.)  A colloquy outside of the presence of the jury resulted after the prosecutor completed his initial closing argument.  The court heard from both parties, which included a discussion of *Craven*, and after a later recess, the court stated as follows:

> All right.  I had time to go back and listen to the portion of the opening argument that [co-counsel for Castañeda] was concerned with.
>
> The—I think this situation is materially different than *State v. Craven* where the prosecutor, among other things, told the jurors to rely on their gut feeling.
>
> I think taken in context, [the prosecutor]'s argument was pointing the jurors to the written instructions and telling them that, in light of the volume and length of the instructions, they would be more easily digested if they recall that the instructions and the law makes common sense and moral sense.  He said, quote, "It's supposed to make good moral sense," end quote.
>
> So I don't find that the argument was objectionable or prejudicial.  And, on occasion, those reviewing a trial professionally disagree with me about conclusions that I make.  And I plan to reread three parts of the jury instructions to the jury:
>
> I plan to tell them that [the prosecutor] made an argument in regard to the law making moral sense, and I want them to be clear that it's the duty of the jury to decide the facts in this case so I plan to reread the first paragraph of instruction 1, the last paragraph of instruction 1, which also tells the jurors not to make their decisions based on their emotions, and then reread the burden of proof instruction, Instruction No. 3.

The court asked whether any parties wanted to be heard on its planned course of action and each declined.  The jurors were then brought back in, and the trial court stated,

> Jurors, this morning during his argument, [the prosecutor] argued that the law is supposed to make good moral sense.  And I want to be very clear with you about your task here in this trial.
>
> As I told you before, all the instructions that I gave you are important, and their order is not necessarily important because they're all important instructions.
>
> I want to highlight three parts for you:

The first comes from the first paragraph of Instruction No. 1. It's your duty to decide the facts in this case based upon the evidence presented to you during this trial.

It is also your duty to accept the law from my instructions regardless of what you personally believe the law is or what you personally think it should be.

You must apply the law from my instructions to the facts that you decide have been proved and, in this way, decide the case.

And, from the final paragraph of that instruction, as jurors, you are officers of this court. *You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference.*

To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict.

I also want to reread Instruction No. 3 to you:

Each defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt.

The defendant has no burden of proving that a reasonable doubt exists. A defendant is presumed innocent. This presumption continues throughout the entire trial unless, during your deliberations, you find it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence.

If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

(Emphasis added.)

The prosecutor's statement here was improper, and the judge appropriately issued a curative instruction. While the prosecutor did not explicitly tell the jury to reach a verdict based on their emotions or intuition, he did affirmatively state that the law was "supposed to make good common sense, and it's supposed to make good moral sense." That is simply not true. Jurors are not tasked with reconciling their "moral sense" with the law as provided by the judge. Rather, pursuant to their

oaths at the completion of jury selection, they are charged with applying the law as provided in the judge's instructions to the evidence presented at trial in order to determine the facts of the case. These duties were provided in the court's instructions and emphasized in great detail through the curative instruction. Specifically, the judge reminded the jurors that it was their "duty to accept the law from [his] instructions, regardless of what [they] personally believe[d] the law [wa]s or what [they] personally th[ought] it should be."

Having concluded that the prosecutor's statement was improper and because defense properly objected to that statement, under *Emery*, we consider whether that misconduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." 174 Wn.2d at 760. As in *Craven*, "the court here correctly stated the law when providing a curative instruction, we presume the jury followed the court's instructions, and nothing suggests the jury was misled." 15 Wn. App. 2d at 391-92. Therefore, Lopez fails to establish prejudice arising from the prosecutor's improper statement during closing argument that was substantially likely to impact the verdict. Accordingly, we decline relief on this challenge.[26]

---

[26] Lopez next relies on a theory of cumulative error to assert that the challenged evidentiary rulings by the trial court and alleged prosecutorial misconduct deprived the appellants of the right to a fair trial. Because we hold that neither Lopez nor Castañeda have established error in the trial court proceedings, his reliance on such a theory is unavailing. *See State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000) (recognizing cumulative error theory applies to "instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial").

III.     Sentencing

      A.     Inclusion of Juvenile Convictions in Adult Offender Score

Castañeda asserts that the sentencing court erred when it included three points from his juvenile convictions arising from his conduct prior to 2023 in its calculation of his offender score. This was error, he avers, because the legislature intended that a law enacted in 2023 regarding consideration of juvenile felonies for the purpose of calculating an adult offender score[27] to apply both prospectively *and* retroactively.

We recently rejected a similar assertion in *State v. Troutman*, 30 Wn. App. 2d 592, 597-600, 546 P.3d 458, *review denied*, 3 Wn.3d 1016 (2024). Castañeda asks that we "not follow [our] recent opinion." We decline his request.

      B.     Vacatur of Murder in the Second Degree Conviction

Lopez asserts that the jury's verdict convicting him of murder in the second degree should be vacated in order to avoid a double jeopardy violation. In so asserting, he acknowledges that this "murder conviction does not appear in the judgment and sentence." He requests as a remedy that we remand this matter for the trial court to enter an order vacating that conviction. Castañeda did not request this relief in his appellate briefing or adopt, pursuant to RAP 10.1(g), the portion of Lopez' briefing requesting this relief.

The State, in response, indicates that it "has no objection to remand for the limited purpose of entering an order of vacation regarding" the convictions for

---

[27] LAWS OF 2023, ch. 415, § 2. RCW 9.94A.525(1)(b) reads, in pertinent part, "For the purposes of this section, adjudications of guilt pursuant to Title 13 RCW which are not murder in the first or second degree or class A felony sex offenses may not be included in the offender score."

murder in the second degree.  We accept the State's proper concession on this point.

Affirmed, but remanded for vacatur of the convictions for murder in the second degree.

WE CONCUR:

Feldman, J.         Cheung, J.